# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

| | | |
|---|---|---|
| BEVERLY STAYART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-C-0116 |
| | ) | |
| YAHOO! INC. | ) | Hon. Rudolph T. Randa |
| OVERTURE SERVICES, INC., d/b/a | ) | |
| ALTA VISTA and VARIOUS, INC., | ) | |
| d/b/a FRIENDFINDER.COM, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF BEVERLY STAYART'S RESPONSE TO DEFENDANT VARIOUS, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6)

COMES NOW, BEVERLY STAYART, Plaintiff, and files this, her Response to Defendant Various, Inc.'s Motion to Dismiss for Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6), and shows the Court as follows:

## I. INTRODUCTION

A person's name is important. A name is an integral part of one's identity, and cannot ever be abandoned. *Abdul-Jabbar v. General Motors Corp.*, 85 F. 3d 407, 411 (9th Cir. 1996). In the play "The Crucible," Arthur Miller has his main character die in order to save his "good name."

One's name often appears in the media (any method for transmission of a portrayal, including the Internet). For example, upon achieving academic or sports honors, upon graduation from school, in connection with a job or hobby, or upon the birth of a child. Usually a person impliedly consents to such publicity.

Most of us also strongly desire media privacy. It is "the ambition of nearly all

civilized men and women . . . [to determine] for themselves how much or how little publicity should surround their daily lives." E. L. Godkin, The Rights of the Citizen -- IV: To His Reputation, 8 SCRIBNER'S 65 (1890).

Without privacy, relations of the most fundamental sort -- respect, love, friendship, and trust -- are inconceivable. "To respect, love, trust, feel affection for others and to regard ourselves as the objects of love, trust, and affection is the heart of our notion of ourselves as persons among persons, and privacy is the necessary atmosphere for those attitudes and actions, as oxygen is for combustion." Charles Fried, Privacy, 77 YALE L. J. 475, 477-78 (1968).

Unfortunately, the media frequently portray real people without any authorization, express or implied. Peter L. Felcher and Edward L. Rubin, Privacy, Publicity and the Portrayal of Real People by the Media, 88 YALE L. J. 1577 (1979). This Court is presented with such a situation herein.

In perhaps the most influential law review article ever published, Samuel Warren and Louis Brandeis (later a Supreme Court Justice) first urged for the recognition of a citizen's right of privacy. The authors grounded their theory on principles of human dignity. Samuel Warren and Louis Brandeis, The Right to Privacy, 4 HARV. L. REV. 193, 205 (1890). They voiced their observations that "[i]nstantaneous photographs and newspaper enterprise have invaded the sacred precincts of private and domestic life; and numerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.'" Id. at 195.

Warren and Brandeis were particularly appalled with the practices of Boston

2

newspapers and the attendant negative effects on society:

> The press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as effrontery. To satisfy a prurient taste the details of sexual relations are spread broadcast in the columns of the daily papers. To occupy the indolent, column upon column is filled with idle gossip, which can only be procured by intrusion upon the domestic circle. The intensity and complexity of life, attendant upon advancing civilization, have rendered necessary some retreat from the world, and man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have become more essential to the individual; but modern enterprise and invention have, through invasions upon his privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury . . . When personal gossip attains the dignity of print, and crowds the space available for matters of real interest to the community, what wonder that the ignorant and thoughtless mistake its relative importance.

*Id.*, at 196.

Accordingly, the authors believed that a legal right of privacy was not only desirable, but also absolutely necessary to protect individuals from the "blighting influence" of gossip and the dangers of media publication. *Id.*

This litigation comes almost 120 years after Warren and Brandeis argued for the creation of a right of privacy. Nevertheless, their concerns still ring true. Today it is not newspapers, but the Internet which is overstepping in every direction the obvious bounds of propriety and decency to satisfy a prurient taste, with attendant negative effects on our society. Defendants Yahoo and Various are nothing but portals to pornography masquerading as legitimate businesses. If this is not enough to warrant condemnation, they both have the audacity to repeatedly connect an innocent and respected Wisconsin citizen in their nefarious endeavors, without her consent.

The tort of invasion of privacy today is acknowledged as comprising four distinct

3

elements: unreasonable intrusion into private affairs; public disclosure of embarrassing facts; presentation of persons in a false light; and appropriation of name or likeness for monetary benefit. William Prosser, <u>Privacy</u> 48 CAL. L. REV. 383 (1960). Most states have now incorporated one or more of these categories into their case law. Many jurisdictions have granted statutory recognition to the right of privacy. Wisconsin has done both.[1]

The first three of these categories protect a person from mental harm resulting from the harsh and unwelcome glare of personal invasion by the media. The focus of the fourth is not only on mental harm, but on the proprietary interests of protecting against misappropriation of one's name or likeness, often for commercial gain.

Dean Prosser has explained (*Id.* at 425):

> As for the appropriation cases, they create in effect, for every individual, a common law trade name, his own, and a common law trade mark in his likeness. They confer upon him rights much more extensive than those which any corporation engaged in business can expect under the law of unfair competition. These rights are subject to the verdict of a jury.

Recovery for misappropriation of one's name or likeness need not stem from a defamatory context to allow recovery. As explained by the Supreme Court:

> In the "right of privacy" cases the primary damage is the mental distress from having being exposed to public view, although injury to reputation may be an element bearing on such damage. Moreover, . . . the published matter need not be defamatory on its face or otherwise, and might even be laudatory and still warrant recovery.

*Time v. Hill*, 385 U.S. 374. 385 n. 9 (1967).

Warren and Brandeis in their landmark article rejected the idea that the right of

4

---

[1] Wisconsin apparently does not recognize "false light" invasion of privacy.

privacy might be property based. 4 HARV. L. REV at 204-05. But about sixty years later a federal court in New York characterized "publicity" as a property right based on commercial considerations, thus separating name or identity appropriation from only stemming from the dignity-based concept of privacy. *Haelan Laboratories, Inc. v. Topps Chewing Gum*, 202 F. 2d 866 (2d Cir. 1953), *cert denied*, 346 U.S. 816 (1953). Cf. *Brown Chem. Co. v. Meyer*, 139 U.S. 540, 544 (1891): "A man's name is his own property, and he has the same right to its use and enjoyment as he has to that of any other species of property."

The commercial aspects of the right of publicity also received a boost from the more recent RESTATEMENT (THIRD) OF UNFAIR COMPETITION (1995). Section 46 identifies the protected interest as "the commercial value of a person's identity," and Section 47 provides that advertising or merchandising uses of an individual's identity are actionable. RESTATEMENT (THIRD) OF UNFAIR COMPETITION (American Law Institute, Philadelphia, 1995), Sec. 46, at 528; Sec. 47, at 546-47. As a practical matter, celebrities are the chief parties who have commercial value in their names and likenesses and frequently enforce their " publicity" rights. But all individuals have legitimate proprietary claims in their publicity interests. *Hirsch v. S. C. Johnson + Son, Inc.*, 90 Wis. 2d 379, 391-92, 400, 280 N.W. 2d 129, 134-35, 138 (1979). M. B. Nimmer, The Right of Publicity, 19 LAW + CONTEMPORARY PROBLEMS 203, 216 (1954).

The Lanham Act governs federally registered trademarks. Effective in 1989, Section 43(a) was substantially rewritten to prohibit a false representation of personal endorsement. As noted by Professor McCarthy: "[T]he new wording of Section 43(a)

5

makes it clearer than ever that Section 43(a) is an appropriate vehicle for the assertion of claims of falsely implying the endorsement of a product or service by a real person." McCARTHY ON TRADEMARKS Sec. 28:15 at 23-19 (2009).

Thus, a person may use this provision to assert a right of publicity under federal law under certain circumstances.

## II. LEGAL STANDARD

In light of the Federal Rules of Civil Procedure's liberal pleading policy, a 12(b)(6) motion to dismiss is disfavored and rarely granted. *Ramiriz v. Walker*, 199 F. App'x 302, 306 (5th Cir. 2006), citing *Lowrey v. Texas A + M University*, 117 F. 3d 242, 247 (5th Cir. 1997). The complaint should be liberally construed in favor of the non-moving party and the Court must determine whether the complaint states any valid claim for relief whenever viewed in the light most favorable to the non-moving party and with every doubt resolved on their behalf. *Id.* A 12(b)(6) motion will only succeed whenever it can be shown that the opposing party did not present "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 554 U.S. 544, -- , 127 S. Ct. 1955, 1960 (2007). A claim cannot simply be conceivable, but must be "nudged . . . across the line from conceivable to plausible." *Id.*

The issue is not "what the plaintiff is required ultimately to prove in order to prevail on her claim, but rather what she is required to plead in order to be permitted to develop her case for eventual adjudication on the merits." *Gorski v. N. H. Dep't. of Corrs.*, 290 F. 3d 466, 472 (1st Cir. 2002). This Court may consider the complaint, documents annexed to it, and other materials fairly incorporated within it when ruling on

6

the motion.  *Rodi v. S. New Eng. Sch. of Law*, 389 F. 3d 5, 12 (1st Cir. 2004).  And, the Court may consider matters that are susceptible to judicial notice.  *Id.*

This includes matters of public record such as documents from prior court proceedings.  *Boateng v. InterAmerican Univ., Inc.*, 210 F. 3d 56, 60 (1st Cir. 2000); *Covad Comms. Co. v. Bell Atl. Corp.*, 407 F. 3d 1220, 1222 (D.C. Cir. 2005), and the "entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint."  *Clorox Co. P. R. v. Proctor + Gamble Commercial Co.*, 228 F. 3d 24, 32 (1st Cir. 2000).  Consideration of such extra materials will not convert a motion to dismiss to one for summary judgment.  *Id.*

### III.   ANALYSIS

### A.   Count VII States A Claim Under Section 43(a)(1)(A) Of The Lanham Act For False/Misleading Representation As To Affiliation/Connection/Association

Various contends (Memo at 3-9) that Count VII fails to meet the pleading requirements of Section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a).  The statute states:

> (1)    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce, any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, <u>false or misleading description of fact, or false or misleading representation of fact</u>, which --
>
> > (A)  is <u>likely to cause confusion, or to cause mistake, or to deceive</u> as to the <u>affiliation, connection, or association</u> of such person with another person, as to the <u>origin, sponsorship, or</u> <u>approval</u> of his or her goods, services, or commercial activities by another person, or
> >
> > (B)  in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities
>
> shall be <u>liable in a civil action by any person</u> who believes that he or she is or is likely to be damaged by such act.  (emphasis added)

7

Under Section 43(a), any misrepresentation that is likely to deceive consumers as to the origin, description, quality, or approval of any good or service is actionable by "any person" who believes he or she is likely to be damaged by such act." 15 U.S.C. Sec. 1125 (a)(1).

The fundamental purpose of trademark law is to protect consumers from being confused as to the source or affiliation of the products or services that they seek to buy.[2] This legal proposition fully applies in the context of the Internet.

Liability under Section 43(a) may arise for a false description or representation even though <u>no</u> trademark is involved. *Smith v. Montoro*, 648 F. 2d 602, 605 n. 3 (9th Cir. 1981); *Cher v. Forum International*, 7 Med. L. Rptr. 2593, 2597, 213 U.S.P.Q. 96 (D.C. Cal. 1982). Section 43(a) has no registration requirements, nor are there any references to "marks." The Lanham Act neither requires nor contemplates the registration or assignment of a personal name. *JA Apparel Corp. v. Abboud*, 591 F. Supp. 2d 306, 324 (S.D.N.Y. 2008).

Also, a person need not be in actual competition with the alleged wrongdoer. *Smith, supra*, 648 F. 2d at 607; *Waits v. Frito-Lay, Inc.*, 978 F. 2d 1093 (9th Cir. 1992), *cert. denied*, 506 U.S. 1080 (celebrity whose endorsement of product is implied through imitation of distinctive attribute of his identity has standing to sue for false endorsement under Lanham Act); *Fuller Bros., Inc. v. International Marketing, Inc.*, 870 F. Supp. 299,

8

---

[2] A trademark is defined in the Lanham Act as a word, name, symbol, or device, or any combination of them, used by a person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. Sec. 1127.

302 (D. Ore. 1994 (plaintiff who brings false association claim under Lanham Act need not be competitor of defendant)).

Section 43(a) created a new federal cause of action for unfair competition. It has been characterized as a "remedial" statute that should be broadly construed. *Gordon & Breach Science Publishers v. AIP*, 859 F. Supp. 1521, 1532 (S.D.N.Y. 1994). The purpose behind Section 43(a) is "the protection of consumers and competitors from a myriad of misrepresentations of products and services in commerce." *Gordon & Breach, supra*, 859 F. Supp. at 1532 (citing *Wojnarowicz v. American Family Ass'n.*, 745 F. Supp. 130, 141 (S.D.N.Y. 1990)).

Various' attack on Count VII is unjustified and simply illustrates how desperate it is to prevent this case from reaching a Wisconsin jury. In its efforts to escape liability under the Lanham Act, Various cavalierly states that Plaintiff's Complaint merely shows that there was a web site of "unknown" origin in which a banner ad for AdultFriendFinder appeared (Document 15, at 5). These allegations, we are told, are "inconsistent" and "undermine" Plaintiff's position.

However, under the common law doctrine of contributory infringement, two or more entities may be held responsible for wrongful appropriation. *See, Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc.*, 443 F. 2d 1159, 1162 (2d Cir. 1971):

> [O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a "contributory" infringer.

Please see the discussion of contributory infringement and the cases cited at pp. 24-

26 of Plaintiff's Response to Yahoo!, Inc.'s Motion to Dismiss.

This doctrine is not confined to intellectual property litigation. A joint venture is the association of two or more individuals for the purpose of carrying out a single enterprise for profit. *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 80, 886 N.E. 2d 1193 (1st Dist. 2008). And every member of a joint venture can be held liable for the wrongful acts or omissions of the other joint venturers done in the course of the enterprise. *Fentress v. Triple Mining, Inc.*, 261 Ill. App. 3d 930, 940, 635 N.E. 2d 102 (4th Dist. 1994).

Plaintiff has alleged that Various regularly uses marketing "affiliates" (Cplt para 53). A reasonable inference from the allegations in the Complaint is that Various is involved in an illegal joint venture with the web site owner. This is especially true given the fact that Various seeks to dispose of this matter at the pleadings stage, with <u>no</u> answer and <u>no</u> discovery.

Plaintiff asserts that on December 5, 2008, she found two illegitimate search results on the Internet for "bev stayart" (Cplt paras. 111-114). Both contained her name in the URL, which read: http://jewellery.makin.doorway.orge.pl/bev-stayart.html. (*Id.*)

This is a web page's location (Cplt para.32). URLs can be divided into three sections: the protocol ("http://"); the domain or host name, consisting of everything before the first forward slash ("jewellery.makin.doorway.orge.pl"); and the file path, consisting of everything after and including the first single forward slash ("/bev-stayart.html"). *See, National A-1 Advert. v. Network Solutions, Inc.*, 121 F. Supp. 2d 156, 174 (D.N.H. 2000).

Plaintiff's name appears in the post-domain "path" of the URL.

A false designation of origin claim under Section 43(a) requires <u>two</u> basic

10

elements: (1) false designation must have substantial effect on interstate commerce; and (2) false designation must create likelihood of confusion. *Johnson v. Jones*, 149 F. 3d 494, 502 (6th Cir. 1998).

Use of Plaintiff's name in the URL in this improper manner satisfies the <u>second</u> element of her claim.

Someone who places a trademark in the post-domain "path" of a URL thereby hopes to increase the number of visits to a web page. If they do not own the mark, they are trading on the goodwill and brand recognition of the owner, and may be guilty of trademark infringement. Dale M. Cendali, *et al.*, <u>An Overview of Intellectual Property Issues Relating to the Internet</u>, 89 TRADEMARK REPORTER 485, 510 (May-June 1989). Instead of a trademark, the name "bev stayart" was used by Various in the post-domain "path" of this URL to generate customer traffic.

In trademark infringement parlance, this is sometimes referred to as "initial interest confusion." The theory behind this doctrine is similar to the old "bait and switch" scam where the customer sees a potentially high quality item with a familiar trademark on it, decides to purchase the item, but actually purchases a low quality "knockoff" which he originally did not intend to buy. Yelena Dunaevsky, Student Author, <u>Don't Confuse Metatags With Initial Interest Confusion</u>, 29 FORDHAM URB. L.J. 1349, 1363 (2002).

When Plaintiff entered this URL in the browser's location bar of the computer, she did not find a web page sponsored by her or containing any information about her. Instead, the web page was entitled "Meet <u>AdultFriendFinder</u> members near <u>Janesville</u>

11

[Wisconsin] -- Over 20 Million Members" (Cplt para. 115;  Exhibit LL).[3]  This web page contains five graphic images of fully or partially nude women displaying their breasts and buttocks in a sexually suggestive manner (*Id.*).  The same URL is also displayed at the bottom of the web page (*Id.*).

Under the doctrine of "initial interest confusion," a person is lured to look at a web page which displays a familiar name or trademark.  The person soon learns, however, the products or services being sold or advertised are <u>not</u> the brand names he was seeking.  This is exactly what happened in this case.  A person seeking a web page involving information about "bev stayart" is lured to a different web page containing only advertising for <u>AdultFriendFinder.com</u>.

Under the Lanham Act, the harm comes from the fact that potential customers may believe that "bev stayart" is associated with <u>AdultFriendFinder.com</u> and will be too lazy to resume their Internet search for "bev stayart."  Some customers will simply proceed to purchase the goods or services advertised on the web page they were improperly diverted to.  Dunaevsky, *id*.

As explained by one court (*Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F. 3d 1036, 1064 (9th Cir. 1999)):

> Suppose West Coast's competitor (let's call it "Blockbuster") puts up a
> billboard on a highway reading -- "West Coast Video:  2 miles ahead at
> Exit 7" -- where West Coast is really located at Exit 8 but Blockbuster
> is located at Exit 7.  Customers looking for West Coast's store will pull
> off at Exit 7 and drive around looking for it.  Unable to locate a West
> Coast, but seeing the Blockbuster store right by the highway entrance, they
> may simply rent there.  Even consumers who prefer West Coast may find it

12

---

[3] This Court is asked to take judicial notice that Janesville is approximately <u>20</u> miles from Elkhorn, Wisconsin, where Plaintiff resides.

not worth the trouble to continue searching for West Coast since there is a Blockbuster right there. Customers are not confused in the narrow sense: they are fully aware that they are purchasing from Blockbuster and they have no reason to believe that Blockbuster is related to, or in any way sponsored by, West Coast. <u>Nevertheless, the fact that there is only initial customer confusion does not alter the fact that Blockbuster would be misappropriating West Coast's acquired goodwill.</u> (emphasis added)

In its motion to dismiss, Various erroneously contends, without attribution, that Plaintiff could "only" access the web site <u>http://jewellery.makin.doorway.orge.pl/bev-stayart.html</u> by typing it in the browser. To the contrary, one could also access this web site by clicking the link <u>Pm 10kb Loading Cialis -- Online Pharmacy</u> search engine result, found by a search for "Bev Stayart" on both Yahoo and Alta Vista. The results were rotational. Sometimes clicking this link led to the movie screen with Plaintiff's name centered at the top and sometimes it led to alternate web sites, including <u>http://jewellery.makin.doorway.orge.pl/bev-stayart.html</u>, as well as other web sites advertising <u>AdultFriendFinder.com</u>.

Various d/b/a <u>AdultFriendFinder.com</u> has over a quarter-million members in Wisconsin who participate in its on-line adult-oriented social networking services (Cplt para. 51). It regularly advertises these services, which include sex chat, nude webcams and group sex, on the Internet with graphic images of fully or partially nude women (Cplt paras. 50, 52). Plaintiff also accessed the "source code" for this web page (Cplt para.120). This is the HTML code that underlies a web page (Cplt n. 3). Plaintiff's name is centered at the top as the "title" while the name "adultfriendfinder" is <u>also</u> found in this source code document (Cplt para. 120; Exhibit MM).

Plaintiff has never given Various permission to use the name "Bev Stayart" for the

13

promotion of any goods or services on the Internet (Cplt para.22).  Plaintiff is the only "Beverly Stayart" and "Bev Stayart" on the Internet and uses both names (Cplt para. 19). Her name has commercial value because of her humanitarian endeavors, positive and wholesome image, and the popularity of her scholarly posts on the Internet (Cplt para. 21).

Indeed, according to the Internet analytics firm Compete.com, the name "Beverly Stayart" is a <u>competitive</u> <u>keyword</u> <u>phrase</u>.  Complete.com has the primary objective of maximizing marketers' search engine optimization through proper selection of competitive keywords.  According to Compete.com, the starting point is to "find out which search terms are driving and engaging visitors, discover keywords that you need to be bidding on, and invest in keywords that drive the most engagement."  *See*, Compete.com profile/research methodology, at Appendix 1.

Keyword advertising allows companies to select, for each of their ads, "keywords" that will cause those ads to appear on search result pages.  Compete.com has analyzed the results for the competitive keyword search term "Beverly Stayart" for the period January 15 - April 15, 2009.  These results show five destination web sites which have received traffic from users inputting the search term "Beverly Stayart" during this 3-month  period. *See*, Appendix 2.  "Beverly Stayart" <u>continues</u> to be a competitive keyword phrase <u>today</u>. *See*, Appendix 3, "Websites getting traffic from <u>keyword</u> 'beverly stayart' . . . Compete Search Analytics", for the period February 15 - May 15, 2009.

Troy Janisch is a search engine optimization specialist with over 10 years experience in Internet market strategizing.  He has received numerous awards for his work, including the Wolters Kluwer Search Engine Marketing Champion (2008) Award.

14

In an interview with WISCONSIN TECHNOLOGY NETWORK ("WTN NEWS") Troy Janisch asserted, "Most effective search engine optimization (SEO) tactics have one thing in common:  keywords.  By anticipating the search terms used by customers and incorporating them into a web site, marketers can boost their site's natural search engine ranking."  *See*, Appendix 4.

Plaintiff further asserts that Various has deliberately appropriated her name, trading on her goodwill and positive name recognition, to draw visitors to its web site, without her authorization or consent (Cplt para. 125).  Various' described misconduct is false and misleading, within the meaning of Section 43(a) of the Lanham Act, by falsely describing and representing that its adult-oriented social network services are licensed, endorsed or otherwise authorized by Plaintiff (Cplt para. 187).  Various' wrongful actions are also likely to cause confusion or mistake and to deceive customers as to the endorsement, sponsorship, affiliation, connection or association of "Bev Stayart" with AdultFriendFinder.com (Cplt para. 189).[4]

This Court should be advised that there is nothing unusual about sexually explicit ads for this "dating" service suddenly appearing on an unrelated web page on the Internet to generate traffic.  In December, 2007, the Federal Trade Commission ("FTC") sued Various in federal court in San Jose, California.  It was engaged in unfair business practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. Sec. 45(a), according to this suit, case cv-07-6181 JSHRL.

---

[4] "The tie-up of one's name . . . with a business, product or service creates a tangible and saleable product in much the same way as property may be created by one who organizes under his name a business  to build and/or sell houses according to a fixed plan or who writes a book, paints a picture or creates an invention." *Lugosi v. Universal Pictures*, 139 Cal. Rptr. 35, 37 (2d Dist. 1977).

Various and its marketing affiliates were accused of using pop-up ads, spyware and adware to drive traffic to its own websites. Some of these ads included graphic depictions of sexual behavior, exposing consumers, including children, to pornographic images. Such ads were displayed to users of the Internet who were searching online for completely different things than an adult "dating" service, such as "flowers," "travel," and "vacations." The FTC's complaint for Injunctive Relief appears as Appendix 5.

The activities challenged by the FTC are quite similar to the misconduct alleged by Plaintiff. Only here, people searching online for information about "flowers," "travel," or "vacations," instead of "Bev Stayart," will find sexually explicit ads for AdultFriendFinder.com. The same "bait and switch" scam.

Various quickly agreed to a permanent injunction to settle the FTC's charges. A copy of the injunction appears as Appendix 6. This agreement was signed, on behalf of Various, by attorney Ira P. Rothken, who again represents Various in this litigation. Mr. Rothken is also currently representing Various in the *Doe v. FriendFinder Network, Inc.* case. In the case herein, he has failed to mention his intimate knowledge of Judge Laplante's rulings in the *Doe v. FriendFinder Network, Inc.* case. *See*, pp. 25 and 30, *supra*.

The injunction was signed on December 5, 2007 by the FTC. It prohibits the display of unsolicited sexually explicit advertisements for AdultFriendFinder.com on the Internet. "Advertisement" is defined very broadly to include "pop-up, pop-under, banner, frame or window" ads. Stipulated Final Order for Permanent Injunction, at p. 4 (emphasis added).

16

The mandatory FTC injunction has had little effect, if any, on Various' disgusting business practices, as far as Plaintiff is concerned. Exactly <u>one</u> year from the date the FTC agreed to entry of the injunction order, Plaintiff discovered unsolicited, sexually graphic ads connecting her and <u>AdultFriendFinder.com</u> on the Internet, as noted, which ultimately led to this litigation. Such ads may have been on the Internet for months before she discovered them.

Even today, Various continues to use "bev stayart" as an integral part of its "bait and switch" marketing campaign. On Easter Sunday, April 12, 2009, Plaintiff entered the URL <u>http://jewellery.makin.doorway.orge.pl/bev-stayart.html</u> (*see,* Cplt, paras. 112, 114, 116 and 120) in a computer browser. Two sexually explicit banner ads (four photos each) for <u>AdultFriendFinder.com</u> now appeared on a web page instead of only one banner ad associated with "bev-stayart." When she clicked the "View Now!" icon on one of the photos, a Registration Form appeared with the headline "Join for free now to hook up with someone near Elkhorn!" When Plaintiff accessed the View Source of the banner ads, "bev-stayart [1]" appeared as the title tag. These documents appear as Appendix 7.[5]

On April 15, 2009, Plaintiff <u>again</u> typed this same URL in the browser. The site <u>http://banners/adultfriendfinder.com/piclist?background_color%23F3F3F3&border_color</u> appeared. *See*, Appendix 8. The source code for this web site shows "bev-stayart" as the title and "adultfriendfinder" in the body of this document. This is <u>not</u> a third-party web site. <u>It is a web site owned by Various, Inc.</u>. *See,* Appendix 9, "BetterWhois.Com"

---

[5] "Banner ads" are advertisements that are often links to web sites in which a product or service is advertised. *See*, "Banner Ads On Internet Attract Users," NY TIMES, December 3, 1996 at D1.

wherein the <u>Registrant</u> of the domain "adultfriendfinder.com" is Various, Inc.

This web site is also "bait and switch" because the photos may be of models, and not actual members, as AdultFriendFinder's disclaimer attests. But these models <u>consented</u> to their photos being used in this manner and were <u>paid</u> by AdultFriendFinder. Like Plaintiff, these models are not celebrities. Conversely, Plaintiff never gave her authorization or consent for the use of her name and was not paid by AdultFriendFinder.

As if this were not enough, AdultFriendFinder, as recently as April 20, 2009, has placed sexually explicit pop-up ads containing spyware on the following <u>additional</u> URLs, <u>all</u> of which contain a different variation of Plaintiff's name:

1. hot.stayart.biz.st/shofrarefr.html
2. hot.stayart.infos.st/ghinarinis.html
3. hot.stayart.infos.rorielindl.html
4. hots.stayart.infos.cround.html
5. hots.stayart.infos.sndsorer.html
6. bev.stayart.infos.st/uc.html
7. bev-stayart.infos.st/meer.html
8. bev.stayart.biz.st/remodeled.html
9. bev.stayart.biz.st/fthit.html
10. bev.stayart.infos.st/arghiok.html
11. bev-stayart.infos.st/cu.html
12. bev.stayart.infos.st/ks.html
13. hots.stayart.infos.st/rytasusat.html

Even if these URLs could be third-party web sites, without AdultFriendFinder <u>paying</u> them to run their pop-up ads, these sites would have no incentive to open up so many URLs containing Plaintiff's name! Note "hot.stayart" and "hots.stayart" URLs.

Attached as Appendix 10 is an April 2009 letter, from Plaintiff's counsel to Various' lawyers, John F. Hovel and Ira P. Rothken, requesting that they advise Various to remove these false search results, which are in violation of Plaintiff's rights, as well as in

18

violation of the permanent injunction entered by the FTC in December, 2007.

**B.      Plaintiff Has Properly Alleged Use In Commerce By Defendant**
**Of A False Designation Of Origin**

Various urges that Count VII does not sufficiently allege "use in commerce"

within the meaning of the Lanham Act (Document 15, at pp. 6-8).  It relies solely on *1-800*

*Contacts, Inc. v. WhenU.com, Inc.*  414 F. 3d 400 (2d Cir. 2005).

**The Second Circuit case involved trademark infringement.  This is a false**

**designation of origin case, <u>not</u> a trademark infringement case.**

The Second Circuit case involves the grant of summary judgment under Fed. R.

Civ. P. 56.  This case involves the sufficiency of a complaint under Fed. R. Civ. P.

12(b)(6).

*1-800 Contacts* involved the practice of "trademark keying" -- buying and selling

trademark terms as keywords in search engine advertising.  On April 3, 2009, the Second

Circuit held that Google's asserted practice of selling to advertisers a company's

trademark as a search term to trigger the advertisers' sponsored links each time an Internet

user searches the company's trademark was a "use in commerce" within the meaning of

the Lanham Act.  *RescueCom Corp. v. Google, Inc.*, 2009 WL 875447 (2d Cir. 2009).  *See*,

Appendix 11.

The Second Circuit distinguished *1-800 Contacts* by noting that there, the

defendant made no use of the plaintiff's trademark.  2009 WL 875447 at * 129.

Here, as in *RescueCom Corp.*, Plaintiff alleges that Various is using "bev stayart" in the

domain path of a URL of a web page to increase traffic to Various' web site.

19

This Court can find more relevant guidance in the Lanham Act itself for the first element of Plaintiff's case ("use in commerce").

AdultFriendFinder.com claims to operate a dating "service." For services, Section 1127 of the Lanham Act deems that a trademark is used in commerce "when it is used or displayed in the sale or advertising of the services and the services are rendered in commerce . . . . "15 U.S.C. Sec. 1127 (emphasis added). The word "commerce" means all commerce which may be lawfully regulated by Congress. *Id.* And Congress has chosen to regulate the Internet by enacting the Communications Decency Act ("CDA"), 47 U.S.C. Sec. 230.

In essence, Plaintiff alleges that Various, d/b/a AdultFriendFinder.com "displayed" its sexually explicit advertising on a web page on the Internet, which also bore her name in the domain "path" of the URL. Nothing more need be alleged to demonstrate "use in commerce" under the Lanham Act.

The "use in commerce" element of Plaintiff's case is also demonstrated if this Court simply applies the general dictionary meaning to the term "advertising." Black's Law Dictionary defines "advertising" as "[t]he action of drawing the public's attention to something to promote its sale." BLACK'S LAW DICTIONARY 59 (8th ed. 2004). Similarly, Random House Unabridged Dictionary defines "advertising" as "the act or practice of calling public attention to one's product, service, need, . . . by paid announcements in newspapers and magazines, over radio or television, on billboards, etc." RANDOM HOUSE UNABRIDGED DICTIONARY (2d ed. 1993). The term "etc." in this definition would include the Internet.

20

Substituting the <u>Black's Law Dictionary</u> definition into the Sec. 1127 statutory language, the provision will now read "when it is used in ['the action of drawing the public's attention to promote its sale']." Various, and <u>no</u> <u>third</u> party, was using the name "bev stayart" to draw the public's attention to its "dating" service to increase membership. *See*, pp. 16-19, *infra*.

Various just "forgot" to pay Plaintiff, or ask her permission. To paraphrase the district court in a Bette Midler "sound-alike" case, Various is no better than the "average thief." *Midler v. Ford Motor*, 849 F. 2d 460, 462 (9th Cir. 1988), *cert. denied*, 112 S. Ct. 1513, and *cert. denied*, 112 S. Ct. 1514 (1992).

Various urges that it "flies in the face of all common sense" that Plaintiff is the only "Beverly Stayart" and "Bev Stayart" on the Internet. Various knows otherwise. "*The will to believe something that is convenient to believe is strong in all realms*." Kurt Andersen, novelist and host of Public Radio's "Studio 360."

Absolutely nothing suggests that there are other "Beverly Stayart(s). Indeed, Plaintiff <u>is</u> <u>the</u> <u>only</u> "Bev Stayart" or "Beverly Stayart." *See*, "WhitePages.com:" "There is 1 unique 'Beverly Stayart' in the United States." *See*, Appendix 12.

To confirm that Beverly Stayart and Bev Stayart are the same individual, Plaintiff searched for <u>both</u> "Beverly Stayart" and "Bev Stayart" at "People Search & Background Check." These results show there is <u>only</u> <u>one</u> Beverly Stayart nationwide. The two listings on the web page are for the <u>same</u> Beverly Stayart, as shown by her age and current residence in Elkhorn, Wisconsin. Beverly Stayart's given name was "Beverly Anne Beckman." After marriage, she changed her name to Beverly B. Stayart, with the middle

21

initial "B" to represent her maiden name "Beckman." A search for "Bev Stayart" yields exactly the same results. *See*, Appendix 13.

Another search for Beverly Stayart, on "People Search Directory," shows "Beverly Stayart" and "Beverly (Beckman) Stayart" residing in Elkhorn, Wisconsin. Again, this is the <u>same</u> <u>person</u>, as shown by her maiden name "Beckman," her age and her current residence in Elkhorn, Wisconsin. *See*, Appendix 14.

A search for "Beverly Stayart" at <u>names.whitepages.com/last/Stayart</u> shows:

Stayart as a last name: WhitePages.com
Find Stayart. Popularity and maps of all Stayarts . . . 2. Geraldine, 2 listings,
3. Lee, 2 listings. 4. Leroy, 2 listings. 5. **Beverly**, **1** listings . . .

*See*, Appendix 15.

Various refuses to acknowledge that Plaintiff's name "Bev Stayart" is <u>not</u> just some random letters appearing on a URL. As Dean Prosser explained, in discussing misappropriation: "It is the plaintiff's name as a symbol of his identity that is involved here, and not as a mere name." Prosser, LAW OF TORTS 805 (4th ed. 1971). *Cf. Fairfield v. American Photocopy Equip. Co.*, 138 Cal. App. 2d 82, 86, 291 P. 2d 194, 197 (1955):

The exploitation of another's personality for commercial purposes constitutes one of the most flagrant and common means of invasion of privacy.

**C.** **Plaintiff Has Standing To Sue Under The Lanham Act.**

Various urges that as Plaintiff has not alleged in Count VII that she is a "celebrity" she cannot pursue her Lanham Act claim (Document 15, at 9-10).

22

The word "celebrity" does not appear in Section 43(a) of the Lanham Act. The plaintiff class is "any person" who is damaged, not "any celebrity." "Person" is to be broadly interpreted (*Cairns v. Franklin Mint Co.*, 24 F. Sup. 2d 1013, 1033 (C. D. Cal. 1998)) (explaining that estate of Princess Diana had cognizable claim for false endorsement under Section 43(a) against a maker of jewelry, commemorative plates, sculptures, and dolls featuring the Princess' likeness). Similarly, the word "celebrity" does not appear in any of the sections of Wisconsin's invasion of privacy statute.

The restrictive interpretation of the statute suggested by Various would also be unworkable, given the fleeting nature of fame. Too often, the celebrity of today is a non-celebrity tomorrow.[6] As stressed by one commentator: "The ephemeral and relative nature of "celebrity" and "fame" makes such concepts much too slippery to use any firm ground for overall legal analysis." J. Thomas McCarthy, 1 THE RIGHTS OF PUBLICITY AND PRIVACY Sec. 4:3 at 197 (2d ed. 2008).

Trademarks are federally protected, in part, to protect the goodwill of their owners. The Supreme Court has said "[n]ational protection of trademarks is desirable . . . because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985) (emphasis added). It is a reasonable inference from the Complaint that Plaintiff's reputation has been sullied in the mind of the public by her

23

---

[6] Remember the five stages of a typical movie star: (1) "Brad who?" (2) "We need Brad Pitt for this role!" (3) "We need a Brad Pitt 'type' for this role! (4) "We need a young Brad Pitt for this role!" (5) "Brad who?"

supposed connection to <u>AdultFriendFinder.com</u>, regardless of whether she is a celebrity.[7]

Modern advertising techniques seek nothing but attention from appropriating personality. Plaintiff submits that the man on the street is entitled to as much protection under the Lanham Act as a celebrity. If a non-celebrity is chosen for an advertising campaign, he must have <u>some</u> commercial value. It is the marketplace which determines the value of name or identity. It may be a person's mere mediocrity that is worth appropriating that is worth protecting. *Accord: McFarland v. Miller*, 14 F. 3d 912, at 919, 921 (3d Cir. 1994) (defendant's act of misappropriation of plaintiff's identity may be sufficient evidence of commercial value); *Matthews v. Wozencraft*, 15 F. 3d 432, 438 n. 2 (5th Cir. 1994) (holding that the right of publicity allows a <u>person</u> to prevent dilution of the goodwill that has been created in his or her image).

To argue that a non-celebrity has no goodwill whatsoever is untenable.

Various' argument flies in the face of common sense. Many advertisers use endorsements by "average" people, often naming them, to attract attention to advertising messages and motivate decisions to purchase. Non-celebrity testimonials probably attract more attention to advertising messages than any other device except celebrity testimonials and have, therefore, long been perennial favorites of marketers. Rudolph, <u>Attention and Interest Factors in Advertising</u>, PRINTERS INK BOOKSHELF 90 (1947); *cf.* PRINTER'S INK, Feb. 19, 1954, at 21.

This fact is recognized by the FTC, which has regulated the advertising use of

---

[7] *Cf. L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F. 2d 26, 31 (1st Cir. 1987) (tarnishment of trademark arises when the goodwill and reputation of owner is linked to products of shoddy quality or which conjure up associations which clash with the associations generated by the owner's lawful use).

testimonials by both public figures and private persons for almost thirty years. Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 C.F.R. Part 255 (effective January 18, 1980).

Various' lawyers are well aware that Plaintiff, although not a "celebrity," has properly stated a valid claim for false designation of origin under the Lanham Act for marketing purposes, which falsely implied her affiliation with, or endorsement of, defendant's "dating" service. *See, e.g., Doe v. FriendFinder Network, Inc.*, 540 F. Supp. 2d 288 (D.N.H. 2008). There, a middle-aged New Hampshire woman, living near Dartmouth College, claimed that AdultFriendFinder.com falsely identified her as a member. She asserted that a bogus profile of her had been on its web site for more than a year when she discovered it. Ira P. Rothken represents defendant Various in this case.

This false profile or portions of it appeared as advertisements or "teasers" on other web sites, assertedly to increase traffic and profits. Suing under a pseudonym, she claimed consumers were deceived as to her affiliation or connection with the company, in violation of Section 43(a) of the Lanham Act.

Judge Joseph N. Laplante in Concord, New Hampshire, expressly rejected the argument of Various that because "Jane Doe" was a non-celebrity, her Lanham Act claim was deficient. Judge Laplante also rejected a similar argument with respect to her claim for invasion of privacy under state law. 540 F. Supp. 2d 288, at 303-04, 306.

Inexplicably, Various' lawyers have failed to distinguish the decision or even bring it to the attention of this Court in their motion to dismiss. A correct statement of the law in this area is simple: the level of plaintiff's fame goes only to the type or amount of

25

damages, <u>not</u> to the existence of the right of privacy/publicity.

   *See, Hogan v. A. S. Barnes & Co., Inc.*, 114 U.S.P.Q. 314 (Pa. Ct. C.P. Phila.

County 1957), wherein the court stated:

> On the one hand, where plaintiff is a person previously unknown to the general public, that is, one who has lived a life of relative obscurity insofar as publicity is concerned, the gist of his complaint is that, by reason of the publication of his picture in connection with the advertisement of a product, he has been unwillingly exposed to the glare of public scrutiny.  In such a case, plaintiff's right of privacy has truly been invaded.

> On the other hand, where plaintiff is a person who may be termed a "public figure", such as an actor or an athlete, the gist of his complaint is entirely different.  He does not complain that by reason of the publication of his picture in connection with the advertisement of a product, his name and face have become a matter of public comment, but rather that the commercial value which has attached to his name because of the fact that he is a public figure has been exploited without his having shared in the profits therefrom.

*Id.* at 315-16.

   This rule, as applied to this litigation, means that Plaintiff should be able to recover monetarily for Various' misappropriation of the <u>commercial</u> <u>value</u> of her name, as well as <u>tort</u> <u>damages</u> for her mental distress.

   Whether Plaintiff has been so damaged and the amount of damages are <u>fact</u> questions, not susceptible for resolution by a motion to dismiss.  *Meyerkord v. Zipatoni Co.*, 2008 WL 5455718 (Mo. App. E.D.) ["false light" invasion of privacy case involving Internet web site;  whether content wrongfully attributed to plaintiff and whether this caused him to suffer shame, embarrassment, humiliation, harassment and mental anguish questions for jury;  trial court's grant of motion to dismiss reversed].  *See*, Appendix 16.

**D.  <u>No Other Necessary Elements Of Plaintiff's Lanham Act Claim Are Absent</u>**

   Next, Various attacks Plaintiff's Section 43(a) Lanham Act claim by urging no

26

"likelihood of confusion" is properly stated, no "injury to interests" protected by the statute is adequately invoked, and "harm," as required by this enactment, is absent (Document 15, at 10-15). In so doing, their counsel demonstrates his considerable obfuscation skills but also shows poor judgment.

Although counsel cites a myriad of cases, all but one of them are before 1988, when the Lanham Act was amended, effective in 1989, to add the statutory language relied on by Plaintiff in this litigation. The "(a)(1)(A) words" in Section 43 only came in through a 1988 amendment by Congress, as set forth by Plaintiff herein.

Counsel's approach is equivalent to an historical discussion of slavery in the context of the *Dred Scott* decision, without mentioning that the 13th Amendment outlawed slavery. Although counsel's recitation of what the law used to be in this area is okay, as far as it goes, he did not advise the Court that he is only providing the broadest of overviews, and the language of the Lanham Act was later changed.[8]

### E. Plaintiff Has Adequately Alleged Claims For Violation Of Her Right Of Privacy Under Wisconsin Law

For the same reasons previously discussed in the context of Plaintiff's Lanham Act claim, she has more than adequately alleged violation of her right to privacy under both the common law and statutory law of Wisconsin. *Cf. Candebat v. Flanagan*, 487 So. 2d 207, 210 (Miss. 1986) (appropriation involves a kind of "trademark" in likeness; reversing directed verdict for defendant on claim that automobile association used plaintiff's automobile accident and name for promotional purposes).

27

---

[8] *Cf.* RESTATEMENT (THIRD) THE LAW GOVERNING LAWYERS (American Law Institute, St. Paul 2000) Sec. 111, comment c at 184: "When relying on a statute . . . a lawyer is . . . required . . . to indicate when it has been amended . . . ".

Apart from the commercial value of "Bev Stayart," which Various clearly misappropriated on the Internet, she should be able to recover <u>substantial</u> damages for injury to her self-esteem.  *Accord:*  RESTATEMENT (SECOND) TORTS Section 652(H) (1977).

Even a cursory outline of the history of the law in this area demonstrates that Plaintiff's position is well supported.  Her position resembles the libel theory that the Supreme Court adopted in *Peck v. Tribune Co.*, 214 U.S. 185 (1909).  A newspaper had published a testimonial for Duffy's Pure Malt Whiskey using Mrs. Peck's photograph without her consent.  The Court stated  that the apparent testimonial might have hurt Mrs. Peck's standing in the community, and held that she had a right to a jury on that theory.

Similarly, in *Kunz v. Allen*, 102 Kan. 883, 172 P. 532 (1918), a woman asserted that she was "the common talk of the neighborhood" when, without her permission, the defendant made motion pictures of her while she shopped in his store, and then exhibited the film at a local movie house to advertise his business.  She complained in a defamation action that the use of her likeness, although accurate, demeaned her because people could think she had consented to the ad for a fee.  However, the plaintiff's witnesses all admitted that the advertising did not really lessen their esteem for her.

The Kansas Supreme Court held that the plaintiff stated a cause of action even though she could <u>neither</u> show special damages <u>nor</u> elicit testimony from any witnesses who thought less of her.  The court assumed that lowered self-esteem alone enabled the plaintiff to reach the jury, which could award <u>substantial</u> general damages.

Thereafter, in *Eick v. Perk Dog Food*, 347 Ill. App. 293, 106 N.E. 2d 742 (1st Dist.

28

1952), the Illinois Appellate Court in Chicago held that the unconsented advertising use of a woman's picture gave rise to a cause of action for invasion of privacy. The defendant urged that the common law only grants recoveries for injuries either to the person or the purse, and "not for mere mental suffering." 106 N.E. 2d at 745.

The appellate court disagreed, explaining:

> In many cases, some involving situations practically synonymous with those now covered by the right of privacy, defendants have been found guilty of technical violations of established contract and property rights where the only real damage sustained by plaintiffs were to their mental well-being. [Citing and discussing cases.]
>
> Thus, objections to the recognition of the right of privacy stemming from the fact that damages for violation of the right are based on mental suffering are not well founded.

Recovery for mental and emotional distress typically connected with the misappropriation of a name, image or likeness has consistently been deemed recoverable under the right of privacy. *See, Bradley v. Cowles Magazine*, 26 Ill. App. 2d 331, 168 N.E. 2d 64 (1st Dist. 1966); *Olan Mills, Inc. v. Dodd*, 353 S.W. 2d 22 (Ark. S. Ct. 1962) ["I can't go out on the street. I am embarrassed. I have lost weight. I can't sleep."]; *McAndrews v. Roy*, 131 So. 2d 256 (La. Ct. App. 1961) [plaintiff called "muscle-head, muscle-brain, muscle-body" and everything but his right name]; *Fairfield v. American Photocopy Equip. Co.*, 158 Cal. App. 53, 322 P. 2d 93 (1958) ["I felt humiliated, embarrassed, chagrined."]; *Joe Dickerson v. Dittmar*, 34 P. 3d 995 (Colo. S. Ct. 2001) [plaintiff who seeks only personal damages for invasion of privacy need <u>not</u> prove the value of her identity].

## F.     **Plaintiff's Claims Are Not Barred By The Communications Decency Act**

Last, but not least, Various erroneously urges (Document 15, at 17-19) that Plaintiff's three claims against it are barred by the Communications Decency Act of 1996, a federal law regulating some aspects of the Internet. Under this law, web site operators enjoy immunity for state tort claims under certain circumstances. However, Plaintiff's three claims against Various are <u>intellectual property</u> claims and <u>not</u> affected in any way by this federal law. A false designation of origin claim against Various under Section 43(a) of the Lanham Act was recently held <u>not</u> barred by this federal law in *Doe v. FriendFinder Network, Inc.*, 540 F. Supp. 2d 288, 303 (D. N.H. 2008). This case is found on [www.techfirm.com](www.techfirm.com) (Rothken Law Firm) at p 3. *See*, Appendix 17. And an invasion of privacy claim under New Hampshire law was also held <u>not</u> barred by this federal law. *Id.*

Inexplicably, Various' lawyers fail to distinguish this case, or even bother to bring it to the Court's attention. Further, counsel's reference to *Morrison v. America Online, Inc.*, 153 F. Supp. 2d 930 (N.D. Ind. 2001) (Document 15, 18) is clearly in error. This was a <u>defamation</u> case for which Section 230 immunity applies. The present case involves <u>intellectual property claims</u>, for which no Section 230 immunity applies.

### IV. <u>CONCLUSION</u>

<u>AdultFriendFinder.com</u> should be put out of business if it takes an Act of Congress to do so. In the interim, this Court should <u>sanction</u> its "attorneys" for their unethical conduct and deny Various' ridiculous motion to dismiss. In the instance that its motion is in any part granted, Plaintiff requests the Court leave to amend the Complaint.

30

Respectfully submitted,

BEVERLY STAYART

By /s/Gregory A. Stayart

<u>May 19, 2009</u>
Date

Gregory A. Stayart, Esq.
N5577 Cobblestone Road
Elkhorn, WI  53121-3820
(262)740-9012

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 19, 2009, I electronically filed with the clerk of the Court the accompanying Plaintiff Beverly Stayart's Response to Defendant Various, Inc's Motion to Dismiss for Failure to State a Claim using the ECF System which will send notification of such filing to registered counsel:

John F. Hovel
@ jfh@kravit.com

David Tonisson
@ tension@sonnenschein.com

/s/ Gregory A. Stayart