# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

BEVERLY STAYART,          )
                              )
          Plaintiff,      )
                              )
         V.                )       Case No. 09-C0116
                              )
YAHOO! INC.                )       Hon. Rudolph T. Randa
OVERTURE SERVICES, INC., d/b/a  )
ALTAVISTA and VARIOUS, INC.   )
d/b/a FRIENDFINDER.COM,     )
                              )
          Defendants.    )

## PLAINTIFF BEVERLY STAYART'S RESPONSE TO
## DEFENDANT YAHOO! INC.'S MOTION TO
## DISMISS COUNTS 1-VI OF PLAINTIFF'S COMPLAINT

COMES NOW, BEVERLY STAYART, Plaintiff, and files this, her Response to Defendant Yahoo! Inc.'s Motion to Dismiss Counts I - VI of Plaintiff's Complaint, and shows this Court as follows:

## I.    INTRODUCTION

Yahoo! and its affiliate, Overture Services, Inc., provide the public with Internet functions and services (Cplt paras. 24, 25). Their commercial search engines allow someone to find web sites containing information, or to look for keywords, including products and services (Cplt para 28).

Anyone can visit the Yahoo! web site for free. Yahoo! is not funded by subscriptions or technology royalties, but by advertisers who pay to promote their products (Cplt para. 27). As an advertising-funded search engine, Yahoo! is inherently biased toward advertisers and away from the needs of the public.

The majority of Yahoo!'s revenue comes from banner advertising deals.[1]  Yahoo! sells space on its web pages to companies willing to promote their products there.  This purchased space not only acts as a visual ad (similar to a magazine ad) but also often contains an actual link to the advertiser's own web site.[2]

Internet advertising has been described as one of the most cost-effective ways to reach the public.[3]  A "click" on a banner ad will immediately transport a person to the web site of the advertiser.  Banner ads are considered superior to other types of ads because they more quickly "hook up" a consumer with a company.[4]  Web sites serve as the functional equivalent of a real-world retail outlet, where people can purchase goods and services.

Advertising on the Internet is "big business."  In 2006, such advertising generated $16.8 billion in revenue, an increase of 34% from the prior year (Cplt, n. 1).  The total spent on Internet advertising has exceeded the amount spent on all outdoor advertising as long ago as 1998.[5]

Yahoo! is a dying company.  Once a leader in the first generation of web search businesses, it failed to develop search technology that grew in sophistication as fast as the Internet.[6]  By May of 2007 newcomer Google's share of online searches in the United States had passed 50% according to one survey, with Yahoo! having but a 26% share.[7]  By

2

---

[1] "Banner ads" are advertisements that are often links to web sites in which a product or service is advertised. *See*, "Banner Ads On Internet Attract Users," NY TIMES,  December 3, 1996 D1.
[2] 27 INTERNATIONAL DIRECTORY OF COMPANY PROFILES (St. James Press 1999) -- "Yahoo Inc." 517.
[3] Randal Stross, PLANET GOOGLE (Free Press 2008) 5.
[4] 27 INTERNATIONAL DIRECTORY, *op. cit.*
[5] Cyrus Afzali, "IAB Internet Ad Revenues Reach $1.92 Billion for '98," INTERNET NEWS, May 3, 1999.
[6] Stross, *op. cit.* 26.
[7] Stross, *op. cit.* 26.

May, 2008, Google had 68.3% of all U.S. Internet searches, with Yahoo! a distant second with only 20%.[8]  As of March 31, 2009, Yahoo!'s share of the U.S. search market had fallen to 15.8%, according to a report compiled by "Nielsen Online."  *See*, Appendix A.

Yahoo!'s revenues have also recently fallen dramatically.  In the third quarter of 2008, its earnings dwindled to $54.3 million, or 4 cents per share, down from $151.3 million, or 11 cents per share for the same period in 2007.[9]

Besides sales of banner ads, another important revenue source for Yahoo! is pornography.  With the possible exception of lawyers, few groups or industries have inspired the long-standing antipathy and scorn that has been directed toward the pornography industry.  However, this has never deterred Yahoo![10]

The evils of pornography have been well documented.  Pornography hurts women directly when women performers are exploited and when violent pornography incites its viewers to commit acts of violence against women.  More fundamentally, pornography hurts women indirectly by perpetuating harmful stereotypes of women as sex objects.  These gender stereotypes reinforce patriarchal social structures that disadvantage women.  *See*, James Peterson, "Beyond the Curtain of Privacy:  How Obscenity Laws Inhibit the Expression of Ideas About Sex and Gender," 1998 WIS L REV 625, 633.

Internet pornography, however, is a lucrative entrepreneurial opportunity, given the

3

---

[8] Stross, *op. cit.* 9.
[9] "Yahoo to dump 1,500 workers as slump deepens in 3Q," SAN JOSE MERCURY NEWS, October 28, 2008, available at http://www.mercurynews.com.
[10] "A "pornographer" is defined in the Oxford English Dictionary as "one who writes of prostitutes or obscene matters;  a portrayer of obscene subjects."  "Obscene" is defined, in part, as "offensive to modesty or decency;  expressing or suggesting unchaste of lustful ideas;  impure, indecent;  lewd."  Oxford English Dictionary, s. v.

phenomenal production and distribution capabilities of the Internet, and its low cost of

start-up.  Pornography has been the World Wide Web's major economic success.

According to a "U.S. News and World Report," online pornography generated $1 billion in

revenues in 1998, or somewhere between 5% and 10% of all online sales.[11]

A large portion of Internet advertising is also devoted to pornography, with Yahoo!

and AltaVista earning their share of this ad revenue.  As described by one author:

> The pornography industry, with its ubiquitous banner ads and  click-through
> programs, accounts for a significant portion of that figure [annual ad revenue]. . .
> [These] advertising dollars, incidentally . . . help highly popular mainstream sites
> such as Yahoo! and AltaVista to pay their own bills.[12]

Yahoo! management also turns a blind eye to pornography regularly appearing on

its discussion groups.  In the opinion of one critic:

> Yahoo is simply a porn fest!  Many chats have porn bots running constantly.
> Even if you say you are underage these spammers will continue to advertise
> through chat rooms, instant messages and/or profiles.  Yahoo management clearly
>          knows of these problems, yet seems to turn their heads for some reason.
>                  *          *          *
> What kind of ISP knows of violations of their own terms of service, knows kids
> can get into their chats by simply lying with no real age verification program, and
> does very little to combat these issues.  This is sick behavior.

*See*, Appendix B.

In 2001, Yahoo! opened an online store stocked with thousands of hard-core DVD

and video tapes.  As such, it was the first major Internet company to embrace the porn

industry.  Other Internet companies, such as Microsoft and America Online, have

steadfastly refused to sell x-rated DVDs and video tapes.  *See*, Appendix C.

4

---

[11] Frederick S. Lane III, OBSCENE PROFITS (Routledge 2001) 34.
[12] Lane, *op. cit.*, 70.

In a May, 2005 report, the Government Accounting Office ("GAO") concluded that Yahoo!'s search technology was largely ineffective in blocking lewd images on the Internet. The authors stated (Appendix D, at 26):

> . . . Yahoo's filter was largely ineffective in blocking pornographic and erotic images . . . During the filtered searches, Yahoo generated a substantial number of pornographic images on two of the known word searches and generated erotic images on the third known word search.

A "known word" is defined in this same GAO Report as a keyword "known to be associated with pornography." *See*, Appendix D, at 17-20.

Another revenue stream heavily relied on by Yahoo! involves appropriation. This litigation isn't Yahoo!'s "first rodeo."

In December, 2006, New England Patriot's quarterback Tom Brady sued Yahoo! in the United States District Court in Los Angeles. In case No. CV-06-7436, his management company, TEB Capital Management, LLC, claimed that Yahoo! had used his photo without authorization in a September 2006 *Sports Illustrated* ad and on banner ads on Yahoo! This was in connection with a "fantasy" football web site.

A copy of the complaint in *TEB Capital Management, LLC v. Yahoo!, Inc.*, is attached as Appendix E.

Mr. Brady alleges that the use of his image connotes a false endorsement under Section 43(a) of the Lanham Act, the federal law regulating trademarks. He further asserts that Yahoo! violated his right of publicity under both the statutory and common law of California.[13]

5

---

[13] "Fantasy" football is big business. *See*, "Wall Street's $1 Million Fantasy League," WALL STREET JOURNAL, October 17, 2008 W1.

In February, 2007, Shannon Stovall, a woman from Cuyahoga County, Ohio, sued Yahoo! in the U.S. District Court in Cleveland, Ohio. In case No. 1:07-cv-00573-DAP, Ms. Stovall claimed that, after signing up for Yahoo!'s web-based e-mail, a picture of her with another woman was sent to new customers without her permission as part of a Yahoo! promotion. A headline read, "Hooray! Your first e-mail" and then gave Yahoo Mail! users tips on how to transfer address book contacts and customize the look of their messages.

Her complaint, *Shannon Stovall v. Yahoo!, Inc.*, is attached as Appendix F. The complaint asserts that Ms. Stovall's image was sent to <u>millions</u> of Yahoo! e-mail users around the world, without her authorization. This violated her right of privacy/publicity under Ohio law, according to the suit.

In October, 2008, American Airlines, Inc. ("American") sued Yahoo! and Overture Services, Inc. in the United States District Court in Ft. Worth, Texas. In case No. 4:08-CV-626-A, American sued Yahoo! to prevent it from "selling" American's trademarks and service marks as "keywords" on its search engine, and also from encouraging advertisers to infringe the AA Marks. The 52-page complaint asserts various theories of unfair and unlawful competition, including, but not limited to, trademark infringement, trademark dilution, vicarious trademark infringement, and false representation under the Lanham Act. Plaintiff has not reproduced a copy of this complaint here, but an 11-page Joint Status Report, filed in this case on March 12, 2009, summarizes the contentions in the litigation. *See*, Appendix G.

**II.     ARGUMENT**

**A.     Section 230 of the Communications Decency Act Does Not Bar Plaintiff's Suit**

6

### 1.    Section 230 Does Not Affect "Intellectual Property" Claims

Yahoo's lawyers first urge that Counts I through VI of the Complaint are barred by the Communications Decency Act of 1996, 47 U.S.C. Sec. 230 (Document 13, at 7-11).[14]

The Communications Decency Act of 1996 is Title V (Sections 501-509) of the Telecommunications Act of 1996. Section 509 of the Telecommunications Act of 1996, entitled "Online Family Empowerment," adds to Title II of the Communications Act of 1934, Section 230, entitled "Protection for private blocking and screening of offensive material." *See*, Appendix H. Section 502 of the Telecommunications Act of 1996 amended 46 U.S.C. Section 223 to criminalize certain offensive, but not obscene, communications via an interactive computer network. But that potion of the law was held unconstitutional in *ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996), *aff'd*, 117 S. Ct. 2329 (1997) and *Shea v. Reno*, 930 F. Supp. 916 (S.D.N.Y. 1996), *aff'd*, 117 S. Ct. 2501 (1997). Apparently neither *ACLU* nor *Shea* affected Section 230.

This law is an attempt by Congress to regulate the Internet. Section 230(c) gives online publishers broad immunity from liability arising out of content they did not wholly or partially create. *See*, Section 230(f)(3) (defining "information content provider[s] -- who are <u>not</u> immunized by this law [See Section 230(c)(1)] -- as "any person or entity that is responsible, in whole or in part, for the creation or development of information . .".

But Section 230 specifically states (*see*, Appendix H):

7

---

[14] Yahoo's lawyers erroneously content that their assertion of an affirmative defense (Section 230 immunity) requires dismissal of Plaintiff's suit pursuant to Rule 12(b)(6), F. R. Civ. P. The assertion of an affirmative defense does <u>not</u> mean that a plaintiff has failed to state a claim. *See, Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant.").

(2)     NO EFFECT ON INTELLECTUAL PROPERTY LAW --

  Nothing in this section shall be construed to limit or expand
any law pertaining to intellectual property.[15]

## **2. All of Plaintiff's Claims Are "Intellectual Property" Claims**

  Plaintiff's nine claims in this litigation involve the Lanham Act, violation of her

right of privacy under Wisconsin statutory law, and violation of her right of privacy under

Wisconsin common law.  Since these claims are properly characterized as involving

"intellectual property," they are in <u>no</u> way affected by Section 230 of the Communications

Decency Act.

  In arguing to the contrary, Yahoo's lawyers grossly mischaracterize Plaintiff's

asserted claims, and ignore the exemption language quoted above, burying their analysis

of the law in footnote 8, like an ostrich buries its head in the sand to hide.

  The words "intellectual property" are not defined in Section 230 of the

Communications Act.

  In the process of construing federal statutes, the established rules of statutory

construction prevail.  *Bardes v. First Natl. Bank*, 178 U.S. 524, 20 S. Ct. 1000, 44 L.Ed

1175 (1900).  A party invoking a statutory exemption has the burden of proof on the

exemption.  *Abrams v. Love*, 254 Ill. App. 428 (2d Dist. 1929);  *AFM Messenger Service,

Inc. v. Dept. of Employment Security*, 198 Ill. 2d 880, 763 N.E. 2d 272 (2001).

  "Property" is commonly regarded as anything that has commercial value -- and

which the law permits to be bought or sold.  There are but two types of property:  real

8

---

[15] In addition to addressing intellectual property laws, Section 230(e) sets forth certain other limitations upon
the immunity created by Section 230 under federal criminal law, state law that is "consistent" with Section
230, and federal and state privacy law.

property (land and similar real estate) and personal property. Under conventional wisdom, every kind of property that is not real property must be personal property. *Cf.* Cal Civ Code Sec. 663 (West 1982).

As such, "intellectual property" is usually characterized as intangible personal property. Intangible personal property is concerned with such matters as trade secrets, trademarks and copyrights, the right of publicity, and unfair competition.[16]

With regard to trade secrets, see *Continental Car-Na-Var Corp. v. Moseley*, 48 P. 2d 9, 12 (Cal. 1944) ("[E]quity will to the fullest extent protect the property rights of employers in their trade secrets . . . "); *Pillsbury, Madison & Sutro v. Schectman*, 64 Cal. Rptr. 2d 698, 704 (Ct. App. 1997) ("trade secrets . . . [are] a form of intellectual property . . ."); *ITT Telecom Prods. Corp. v. Dooley*, 262 Cal. Rptr. 773, 780 (Ct. App. 1989) ("[T]rade secrets have been recognized as a constitutionally protected intangible property interest.").

Trademarks are also described as personal property. *Italian Swiss Colony v. Italian Vineyard Co.*, 110 P. 913, 915 (Cal. 1910) ("[R]elief is granted . . . because a right of property -- *i.e.*, plaintiff's exclusive right to the use of his trademark -- has been invaded."); *Hall v. Holstrom*, 289 P. 668, 671 (Cal. 1930) ("A trademark or design . . . is property, and is therefore susceptible to private ownership."); *Hard Rock Licensing Corp. v. Concession Services, Inc.*, 955 F. 2d 1143, 1148 (7th Cir. 1992) ("[T]he Lanham Act . . . protects trademarks as a form of intellectual property.").

9

---

[16] Trademark law is a subset of unfair competition law. Richard Stim,   PATENT, COPYRIGHT & TRADEMARK 345 (Nolo, 9th ed. 2007).

Common law copyrights are likewise "property." *See, Desny v. Wilder*, 299 P. 2d 257, 271 (Cal. 1956) (noting that "common law protects . . . a property right . . . "); *Weitzenkorn v. Lesser*, 256 P. 2d 947, 956 (Cal. 1953) ("California now accepts the traditional theory of protectible property under common law copyright.").

The right of publicity is a widely recognized intellectual property right. *See, ETW Corp. v. Jirch Publ'g. Inc.*, 332 F. 3d 915, 928 (6th Cir. 2003) (stating that "[t]he right of publicity is an intellectual property right of recent origin"); *Allison v. Vintage Sports Plaques*, 136 F. 3d 1443, 1448 (11th Cir. 1998) (the common law right of publicity is an intellectual property right for purposes of the first-sale doctrine); BLACK'S LAW DICTIONARY 813 (7th ed. 1999) (defining intellectual property as "A category of intangible rights protecting commercially valuable products of the human intellect. The category comprises primarily trademark, copyright and patent rights, but also includes trade-secret rights, publicity rights, moral rights, and rights against unfair competition.").

In this lawsuit, Plaintiff asserts that the Defendants have improperly appropriated her name for commercial gain on the Internet. As such, Plaintiff obviously seeks to enforce her intellectual property rights to the <u>exclusive use</u> of her name.

The United States Supreme Court has analogized the right of publicity to intellectual property interests in *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 573 (1977). In this case, a circus performer refused to give a television station permission to tape his human cannonball act, but they did so anyway. *See*, Appendix I. When his performance was broadcast on the evening news, he successfully claimed misappropriation of his professional property.

10

Secondary sources have likewise <u>not</u> been silent on this concept. For example, the World Intellectual Property Organization ("WIPO") states that "intellectual property" refers to the "products of the mind: inventions, literary and artistic works, any symbols, <u>names</u>, images, and designs <u>used</u> <u>in</u> <u>commerce</u>" (emphasis added). Jennifer Davis, INTELLECTUAL PROPERTY LAW (Oxford University Press, 2008). The WIPO is established as a specialized agency of the United Nations charged with promoting and administering intellectual property matters on behalf of its member countries. *Id.*, at 9.

Another author has explained:

The appropriation tort, as it is often called, is a common-law tort. It is largely a creature of judicial imagination, not the product of a law enacted by the legislature. The tort gives each of us a legal interest, akin to a property interest, in controlling the use of our name or likeness or performances to prevent commercial use of them by another person. The interest is much like a copyright enjoyed by a songwriter or an author, or a trademark granted to a product. But it is much wider in scope: it applies to the use of a person's name or photograph or likeness; and it prohibits the use by someone else for their benefit, whether commercial or not.

Branson, Randall, HOW FREE CAN THE PRESS BE? (University of Illinois Press 2003) 108.

And see, Gregory, Saber and Grossman, INTRODUCTION TO INTELLECTUAL PROPERTY LAW (BNA, Washington, D.C. 1994) 1-2:

Generally, intellectual property includes the rights provided by the laws of patents, copyrights, and trademarks. However, the laws recognize other protections for the results of intellectual creativity, including trade secret, trade dress, <u>personality</u>, <u>false designation of origin</u>, and other types of unfair competition. (emphasis added)

### 3. <u>Yahoo, Overture Services And Various Enjoy No Statutory Immunity</u>

In applying Section 230 of the Communications Decency Act, courts have not

11

been hesitant in rejecting the contention that a defendant enjoys statutory immunity where intellectual property rights may have been violated.

In *Gucci America, Inc. v. Hall & Assoc.*, 135 F. Supp. 2d 409 (S.D.N.Y. 2001), the plaintiff's complaint alleged that a company called Mindspring hosted another defendant's web page, that Mindspring was informed that the other defendant was using Mindspring's services to aid in <u>trademark</u> <u>infringement</u> and <u>unfair</u> <u>competition</u>, and that Mindspring failed to take any action whatsoever to stop it.

Mindspring urged that Section 230 immunized it from liability for information posted on the Internet because it was an "interactive computer service" and that the other defendant was the "information content provider" of the content at issue.

The plaintiff conceded that Mindspring was an "interactive computer service" and that the other defendant was the "information content provider" under Section 230 of the content at issue. But it urged that Mindspring enjoyed <u>no</u> immunity because Section 230 specifically provided that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property."

The New York federal court noted that, under existing trademark law, a publisher could be held liable for trademark infringement under certain circumstances. Accordingly, it held that immunizing Mindspring from plaintiff's claims would "limit" the laws pertaining to intellectual property, contrary to the wishes of Congress. A motion to dismiss the suit was denied.

This Court should follow the reasoning of the *Gucci* case, and deny Yahoo's motion to dismiss. If this Court were to dismiss Plaintiff's claims, it would likewise

12

improperly "limit" the laws pertaining to intellectual property, contrary to the wishes of Congress.

See also, Ford Motor Co. v. GreatDomains.com, Inc., No. 00-CV-71544-DT (E.D. Mich. 2001), 60 U.S.P. Q. 2d 1446.  A copy is attached as Appendix J.

In this case, an Internet service provider's motion to dismiss a suit based on Section 230 was denied because "[t]his language [Section 230(e)(2)] unambiguously precludes application of Section 230's grant of immunity to the facts of this case.  If, as alleged by Plaintiff, Great Domains has violated federal trademark laws, Section 230 cannot be construed to limit adjudication of those laws."

Accord:  Whitney Information Network, Inc. v. Verio, Inc., 79 U.S.P.Q. 2d 1606, 2006 WL 66274 (M.D. Fla. 2006) (dismissing state law tortuous interference and defamation claims, applying Section 230 immunity, but retaining Section 43(a) Lanham Act and state trademark claims);  Anthony v. Yahoo! Inc., 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal. 2006) (Yahoo! may simultaneously be <u>both</u> an "internet service provider" <u>and</u> "internet content provider";  no Section 230 immunity for misrepresentation claims arising out of dating service's alleged creation of false profiles which induced plaintiff to maintain his membership there).[17]

Plaintiff's position is supported by a secondary authority. See, J. Thomas McCarthy 1 THE RIGHTS OF PUBLICITY AND PRIVACY Sec. 3.42 at 178 (2d ed. 2008):

> Does the CDA immunity granted to ISPs also extend to cases alleging infringement of the state law right of publicity? 47 U.S.C. Sec. 203(e)(2) of

13

---

[17] The Court is asked to take judicial notice of the existence of numerous adult "dating" services polluting the Internet.  Doe v. Sexsearch.com, 502 F. Supp. 2d 719,  728 (N.D. Ohio 2007) (also construing Section 230 immunity).

the CDA provides that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property." The author has opined that the right of publicity is a species of state law based intellectual property. Under this view, the statutory immunity would not apply. [Footnotes omitted.]

In moving to dismiss, Yahoo's lawyers urge the Court to follow two cases,

*Kruska v. Perverted Justice Foundation, Inc.*, 2008 WL 2705377 (D. Ariz.) and *Perfect 10, Inc. v. CCBill LLC*, 488 F. 3d 1102 (9th Cir. 2007). *See*, Document 13, 8, footnote 8.

As to *Kruska*, Yahoo's lawyers bury this case in a footnote for good reason. The plaintiff was a *pro se* litigant. With all due respect to a *pro se* litigant, the federal court in Phoenix did not really obtain the benefit of "study and illumination" of the law from plaintiff's attorney [there was no plaintiff's attorney!].

A more serious problem is that Ms. Kruska's *pro se* complaint in that case contains no Section 43(a) Lanham Act claim. *See*, Appendix K. It is not the most well-written complaint, but clearly contains no reference to the Lanham Act or false endorsement. Although Judge Stephen M. McNamee in his opinion in *Kruska* does rule on a Lanham Act claim, finding immunity under Section 230, that claim is completely absent from Ms. Kruska's *pro se* complaint filed on January 10, 2008.[18]

In *Perfect 10, Inc. v. CCBill, LLC*, No. CV 02-7624 (C.D. Cal., June 24, 2004), *rev'd* 481 F. 3d 751 (9th Cir. 2007), the district court correctly held that Section 230 did not apply to state right of publicity and state law trademark claims because such claims

14

---

[18] One is reminded of the judge who takes over the questioning of a key witness in front of the jury, over the objection of the plaintiff's attorney. When the judge goes into an area which the plaintiff's attorney wished to avoid, he says, "Judge, I don't mind if you try this case, but just don't lose it for me!" Judge McNamee took over Ms. Kruska's case but then "lost" it for her.

involve <u>intellectual</u> <u>property</u>.

The same reasoning should apply herein.

On appeal, the 9th Circuit held in *Perfect 10* that the term "intellectual property" should be <u>restricted</u> to only federal intellectual property claims. 481 F. 3d 751, 768 (9th Cir. 2007).

In so ruling, the Ninth Circuit violated a fundamental rule of statutory construction. In the construction of a statute, generally a court may write no limitations therein. A statute may <u>not</u> be restricted, constricted, qualified or narrowed. *Brogan v. United States*, 522 U.S. 398, 188 S. Ct. 805, 139 L. Ed. 2d 830 (1998); *Norwood Morris Plan Co. v. McCarthy*, 295 Mass. 597, 4 N.E. 2d 450 (1936); *Butte Miners' Union v. City of Butte*, 58 Mont. 391, 194 P. 149 (1920); *Payne v. Ostrus*, 50 F. 2d 1039 (8th Cir. 1931). *Cf. Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("[W]hen looking at its language, a court should presume that the statute says what it means.").

For this very reason, the United States District Court in Concord, New Hampshire, recently <u>refused</u> to follow this strained interpretation of Section 230 by the Ninth Circuit. *Doe v. FriendFinder Network, Inc.*, 540 F. Supp. 2d 288 (D. N.H. 2008). In that case, a woman brought a state right of publicity claim against an Internet dating service arising from material posted by a <u>third-party</u> user. Judge Joseph N. Laplante held that her claim, as well as a related claim under Section 43(a) of the Lanham Act, was <u>not</u> subject to dismissal under Section 230.

Yahoo's lawyers are the <u>second</u> <u>team</u> of lawyers aligned against Plaintiff who failed to <u>cite</u> this case or <u>distinguish</u> <u>it</u> in any fashion from the instant case. As Yogi

15

Berra once exclaimed: "It's *déjà vu* all over again!" Yahoo's lawyers should be admonished by the Court for their "sharp practice." Why must it always be the "country" lawyer who solely finds this Internet case?

Yahoo! is hardly a mere "messenger," like the defendant in the *Craigslist* case, 519 F. 3d 666 (7th Cir. 2008) (Document 13, 11). Yahoo's misconduct violates <u>both</u> the Lanham Act and Wisconsin law, destroying any statutory immunity it might otherwise enjoy. This is true regardless of who else may have authored the content of material on any third-party web sites.

**4. <u>Section 230 Of The Communications Decency Act Should Be Narrowly Construed</u>**

In passing new legislation, Congress often has a reason.

In enacting Section 230, Congress' prime concern was to overrule the holding in a defamation case, *Stratton Oakmont, Inc. v. Prodigy Services, Inc.*, 1995 WL 323710 (N.Y. Sup. May 24, 1995); 23 Media L. Rptr. 1794 (N.Y. Sup. Ct. 1995). In this case, Prodigy was held liable for publishing defamatory statements on an Internet bulletin board authored by one of Prodigy's customers.

Under the common law tort of defamation, a legal remedy is provided to those injured by malicious gossip. An individual is subject to liability if he or she damages another person's reputation by speaking or publishing false statements about that person to a third party. RESTATEMENT (SECOND) OF TORTS Section 558 (1977).

Furthermore, an individual need <u>not</u> be directly involved in the creation of the defamatory material to be held liable. Consider the English case of *Hird v. Wood*, 38 So. J.

16

234 (1894).[19]  A libelous placard having been erected on the roadside, the defendant sat by it, saying nothing, but constantly pointing to the placard so as to attract it to the attention of the passers-by.  <u>Held</u>, that there was evidence of <u>publication</u> by the defendant which ought to have been left to the jury.

Applying this concept to the Internet, it could be urged that a search engine which brings the attention of the public, through its search results, to false and defamatory material, has published them.  In this context, "publication" means communication of libelous matter to a third person.

This is similar to what happened in *Stratton Oakmont*.  Prodigy was held liable for publishing defamatory statements because Prodigy frequently monitored the information on the interactive computer service and removed offensive material.  *Stratton Oakmont*, 1995 WL 323710, at * 4.

Congress was concerned about defamation liability so Section 230 was <u>specifically</u> <u>enacted</u> to overturn this decision and similar holdings involving <u>repetition</u> <u>of</u> <u>defamatory</u> third party statements.

The Conference Report on Section 230 (S. CONF. REP. NO. 104-230, at 435 (1996)) <u>as reprinted</u> in 1996 U.S.C.C.A.N. 10 states as follows:

House amendment

Section 104 of the House amendment protects from civil liability those providers and users of interactive computer services for actions to restrict or to enable restriction of access to objectionable online material.

---

[19] Discussed in W. Blake Odgers and Robert Ritson, A DIGEST OF THE LAW OF LIBEL AND SLANDER 139 (6th ed., London 1929).

Conference agreement

The conference agreement adopts the House provision with minor modifications as a new section 230 of the Communications Act. This section provides "Good Samaritan" protections from civil liability for providers or users of an interactive computer service for actions to restrict or to enable restriction of access to objectionable online material. One of the specific purposes of this section is to overrule *Stratton-Oakmot v. Prodigy* and any other similar decisions which have treated such providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material. The conferees believe that such decisions create serious obstacles to the important federal policy of empowering parents to determine the content of communications their children receive through interactive computer services.

Yahoo's lawyers imply that Section 230 automatically gives their client a federal immunity to <u>any</u> and <u>all</u> causes of action (Document 13, at 7). This is <u>patently</u> untrue! Apparently faced with a "must win" case, the "officer of the court role" for Yahoo's lawyers "falls by the wayside." Marianne M. Jennings, "The Model Rules and the Code of Professional Responsibility," 1996 WIS L REV 1223, 1228.[20] The Communications Decency Act was not meant to create a lawless no-man's land on the Internet. *Fair Housing, op. cit.*, 521 F. 3d at 1164.

Because Congress only intended to overrule *Stratton*, courts, including this Court, should read the statute <u>narrowly</u> and <u>only</u> apply it in the context of defamation claims. Note, "Negligent Publication of Statements Posted on Electronic Bulletin Boards: Is There Any Liability After *Zeran*?" 39 SANTA CLARA L REV 905, 929 (1999).

There are <u>no</u> defamation allegations in Plaintiff's 44-page complaint. Furthermore,

18

---

[20] To "provid[e] immunity every time a website uses data initially obtained from third parties would eviscerate [the statute]." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F. 3d 1157, 1171 (9th Cir. 2008).

Yahoo's argument conveniently ignores the statutory language exempting intellectual property laws, which directly implicate Yahoo in wrongful conduct.

Another separate reason why this Court should interpret Section 230 narrowly arises from the context of this litigation. As repeatedly stressed, Plaintiff essentially seeks to prevent the Defendants from wrongfully appropriating her name for commercial gain on the Internet.

The Anticybersquatting Consumer Protection Act of 1999 ("ACPA") provides under Section 3002(b) that:

> Any person who registers a domain name that consists of the name of another living person, or a name substantially and confusingly similar thereto, and with the specific intent to profit from such name by selling the domain name for financial gain to that person or any third party shall be liable in a civil action by such person.

15 U.S.C. Sec. 1129(1)(A) (emphasis added).

The broad interpretation of Section 230, urged by Yahoo's lawyers, would undermine the clear policy of this subsequently enacted "cyber piracy" law, by which Congress has expressly recognized the importance of the name of a living person on the Internet.

Furthermore, Section 230(b)(5) of the Communications Decency Act provides that "[i]t is the policy of the United States . . . to ensure vigorous enforcement of federal criminal laws and to deter and punish trafficking in obscenity, stalking, and harassment by computer" (emphasis added). Plaintiff filed this lawsuit to prevent her continued harassment by means of computer by Yahoo! and Various. This is through the civil remedy of misappropriation. Far from being at odds with the Communications Decency

19

Act, this lawsuit finds support in the clear statutory language quoted above.

On the <u>Pm 10kb Loading Cialis -- Online Pharmacy</u> Yahoo search result for "Bev Stayart," the snippet language clearly <u>mocks</u> Plaintiff: "Pm 10kb loading cialis January th, at: hi friends i met you in the <u>tim horton s</u> on <u>bloor st</u> a few sundays ago i . . on february <u>bev</u> <u>stayart</u> on <u>march</u> th . . .". *See*, Appendix L and Cplt, paras. 60, 61 and 76. Tim Hortons is a chain of coffee shops headquartered in Canada. The Tim Hortons in Yahoo's snippet language is on <u>Bloor</u> <u>Street</u> in <u>Toronto,</u> <u>Canada.</u> Plaintiff has never traveled to Canada and has pledged to the Humane Society of the United States ("HSUS"), as part of its campaign to stop the annual seal slaughter, that she will not travel to Canada or buy from Canada as long as the baby seal slaughter continues.

A Yahoo search result for "Bev Stayart" immediately below the <u>Pm 10kb Loading Cialis -- Online Pharmacy</u> result is <u>I give it my Seal of approval!/Nigel Barker.tv</u>, a site maintained by the HSUS to preserve the baby seal population in eastern Canada. Nigel Barker is a world-famous photographer who photographed the baby seals in the spring of 2008 shortly before the annual slaughter. He invited comments on this web site about the impending slaughter. On <u>March</u> 29th, 2008, Bev Stayart posted the following comment: "The baby seals are very curious and friendly towards the sealers as the men approach, as any baby is towards someone new in his environment. This is what is so heartbreaking -- the seals' misreading of the cruel intentions of the men. The pain of their death is unimaginable as many are skinned alive. The sadism and cruelty of Canadians have affected me so deeply that <u>I</u> <u>will</u> <u>never</u> buy another Canadian product or <u>set</u> <u>foot</u> <u>on</u> <u>Canadian</u> <u>soil</u>." *See,* Appendix M and Cplt, paras. 95, 96, 97 and 98.

Yahoo, in its search engine results, mocks Plaintiff by <u>falsely</u> <u>misquoting</u> her as peddling male sexual dysfunction drugs: "<u>Bev</u> <u>Stayart</u> <u>Buy</u> <u>Cialis</u> <u>Viagra</u> <u>Levitra</u>" instead of quoting her actual post on the Nigel Barker web site!  *See,* Appendix L.

With reference to Yahoo's contention that Beverly/Bev Stayart is not the only "Beverly/Bev Stayart," please see Plaintiff's Response to Various' Motion to Dismiss, at 21-22, wherein four separate search results identify only <u>one</u> Beverly/Bev Stayart.

**B.**     **There Are No Deficiencies In Plaintiff's Claims**

**1.**     **Plaintiff Has Properly Stated A Claim Under Section 43(a) Of The Lanham Act**

Yahoo's lawyers further attack Plaintiff's Lanham Act claims, urging that Plaintiff has not alleged that Yahoo! has ever used the name "bev stayart" on its own products and services (Document 13, 12-14), citing *Heartland Beef Inc. v. Lobel's of New York LLC*, 2009 WL 311087 (S.D. Tex. 2009).

Charitably put, this argument is pure hogwash.  Under Section 43(a) of the Lanham Act, all that is required is a false or misleading representation of fact likely to cause consumer confusion as to the origin, sponsorship, or approval of goods or services. *Warner Bros. Entm't Inc. v. Ideal World Direct*, 516 F. Supp. 2d 261, 268 (S.D.N.Y. 2007);  *Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*, 2006 WL 2289847, at * 10-11 (S.D.N.Y., Aug. 8, 2006).

As explained fully in responding to the separate motion to dismiss filed by co-defendant Various, the name "Beverly Stayart" is a <u>competitive keyword phrase</u>.  Please see Plaintiff's Response to Various' Motion to Dismiss, at 14-15.

"If you don't have the right keywords/phrases optimized on your website, you

21

won't get the targeted traffic that you need.  Targeted traffic is visitors who stay on your site and read your information, buy your product or service, subscribe to your newsletter, request more info, or otherwise take action."[21]

Keyword advertising allows companies to select, for each of their ads, "keywords" that will cause those ads to appear on search results.  Yahoo! sells "keyword" advertising.

Keyword advertising works as follows.  If you search for golf clubs on the Internet, and you get a banner ad about Pepsi that you might drink on the golf course, you have been exposed to a "keyword" ad.[22]  In this example, a soft drink company has "purchased" the

competitive keyword phrase "golf course" from a search engine.  Whenever a visitor to the Internet enters the search term "golf course" an ad for a soft drink will appear.

The "problem" is what happens if a trademark or trade name is purchased as a keyword .  Suppose the company Minolta sells camera and film.  To boost sales on the Internet, it purchases the word "Kodak" from Yahoo!  When any Internet visitor uses the search term "kodak" to find information about cameras and film sold by Eastman Kodak of Rochester, New York, banner ads for Minolta cameras and film will now appear.  If a person "clicks" on the ad, Yahoo! will receive a fee, and Minolta might make a sale.  If we assume further that neither Minolta nor Yahoo! hold any rights to the trade name "kodak," Eastman Kodak might decide to sue.  Minolta could be sued for trademark infringement,

---

[21] Successful-sites.com at http://www.successful-sites.com/articles/promotion-marks-keywords.php.

[22] Stross, *op. cit.* 6.

while Yahoo! could be sued for <u>contributory</u> trademark infringement.   While Yahoo! did

not actually sell any cameras or film, it could still be a defendant.

In this litigation, Yahoo! knew early on, because of a Federal Express letter sent by

Plaintiff's attorney to its legal department, that Plaintiff had absolutely no connection or

affiliation to an online pharmacy selling sexual dysfunction drugs.  *See*, paras. 99-110 of

the Complaint ["Disregard of Bev Stayart's Rights"].  As set forth, Plaintiff repeatedly and

continuously advised Yahoo! since September, 2008, that someone was violating her rights

under the Lanham Act.   And Yahoo! took absolutely <u>no</u> <u>action</u> whatsoever for <u>over</u> <u>ten</u>

<u>weeks</u> to remove these illegitimate search results from its search engines, Yahoo!

and AltaVista (*id.*).  Even today, similar illegitimate search results still appear on both the

Yahoo! and AltaVista search engines, improperly connoting an affiliation between her and

sexual dysfunction remedies, which themselves are trademarks (*id.*).[23]

A reasonable inference from the complaint is that Yahoo! has sold the search term

"beverly stayart" as a <u>competitive keyword phrase</u> to companies selling their wares on the

Internet.  After all, Yahoo! is in the business of appropriation, and has a well-documented

history of doing this recently.[24]

Yahoo!'s motive and intent cannot be resolved on a motion to dismiss.  The law

looks to conduct, more than self-serving denials, in determining the facts.

23

---

[23] The fact that someone apparently was offering sexual dysfunction drugs on the Internet should have
immediately alerted Yahoo! that possible illegality was involved.  These drugs all require a written
<u>prescription</u> and <u>only</u> after meaningful review by a <u>physician</u> of the patient's history as to whether the
medication is appropriate.

[24] Only full discovery can determine what exactly happened.  This Court at this juncture must accept
Plaintiff's representation that she did <u>not</u> give Yahoo! or any third party a license to use her personal name
on the Internet for commercial purposes.

As the Supreme Court observed, in a copyright infringement case, advertising and solicitation are traditional <u>indicia</u> of intent to abet illegality. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 125 S. Ct. 2764, 2779, 162 L. Ed. 2d 781 (2005) ("The classic . . . direct evidence of unlawful purpose . . [is] advertising."). *Cf. Eastwood v. Superior Ct.*, 198 Cal. Rptr. 342, 349 (Cal. App. 2 Dist. 1983) ("The first step toward selling a product or service is to attract the consumers' attention.")

Yahoo's trademark policies have hardly been a model of propriety in the past. Yahoo! is a member of CADNA, the Coalition Against Domain Name Abuse. But according to an anonymous blog on the Coalition's home page (*see*, Appendix N):

> Yahoo's search engine advertising practices are among the worst kinds of infringement on the Internet today because they divert traffic likely intended for a brand owner's site and often monetize this traffic at the direct expense of the brand owner.
>
> What I really want to know is how much Yahoo cost companies worldwide in diverted consumer sales and enforcement expenses? Yahoo is, without a doubt, the single largest violator of trademark law online in the United States.

Assuming, *arguendo*, that Yahoo! is simply a "victim" of a third-party's marketing scheme, it still remains liable to Plaintiff under the doctrine of contributory infringement pursuant to the Lanham Act.

The Supreme Court has determined that contributory trademark liability should be imposed on a defendant that either (1) "intentionally induces another to infringe a trademark" or (2) "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood Labs, Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 853-54 (1982).

24

Until recently, manufacturer/distributor relationships were the usual type that gave rise to claims of contributory infringement. But the Seventh Circuit, in *Hard Rock Licensing Corp. v. Concession Services, Inc.*, 955 F. 2d 1143 (7th Cir. 1992), extended contributory trademark liability to the landlord context.

The Restatement (Second) of Torts observes that a landlord is responsible for the torts of those it permits on its premises "knowing or having reason to know that the other is acting or will act tortiously . . . " RESTATEMENT (SECOND) OF TORTS Sec. 877(c) & *cmt. d* (1979). Yahoo!, in effect, let an online pharmacy on the "premises" of its search engine result pages for "bev stayart" when it knew or should have known that the Lanham Act rights of Plaintiff were being violated.[25]

Willful blindness now "is a sufficient basis for a finding of violation of the Lanham Act." *Hard Rock Café*, 955 F. 2d at 1148 (citing *Louis Vuitton S. A. v. Lee*, 875 F. 2d 584, 590 (7th Cir. 1989)). Under such a test, the fact that Yahoo! itself did not sell sexual dysfunction drugs using "bev stayart" as a lure is irrelevant.

*Cf. Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F. 3d 980, 984 (9th Cir. 1999) (even though an internet service provider did not supply a "product" to infringing third parties, a court could "consider the extent of control exercised by the defendant over the third party's means of infringement" to determine if actual or constructive knowledge of the third party's infringement would give rise to contributory liability); *Playboy Enters.*

25

---

[25] Note that if Yahoo! promised to remove objectionable material from its search engine results page originally provided by a third party, and failed to honor such promise, it may be liable under the doctrine of promissory estoppel, despite initial Section 230 immunity. *See, Barnes v. Yahoo!, Inc.*, No. 05-36189, United States Court of Appeals for the Ninth Circuit, filed May 7, 2009. Promissory estoppel is recognized in Wisconsin as an alternative basis for breach of contract. *Cosgrove . Bartolotta*, 150 F. 3d 729 (7th Cir. 1998).

*v. Webbworld, Inc.*, 968 F. Supp. 1171, 1177 (N.D. Tex. 1997) (finding a bulletin board service vicariously liable because the presence of infringing content attracted users to the site); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 499 (E.D. Pa. 2006) (defendant may be vicariously liable for infringement if he enjoys direct financial benefit from another's infringing activity and he has the right and ability to supervise infringing activity) (*dicta*).

Plaintiff has requested a jury herein. Based on the allegations of the complaint, a reasonable jury could find that Yahoo! had <u>actual</u> knowledge that infringing web site owners were improperly using Plaintiff's name for commercial purposes, in violation of the

Lanham Act. Similarly, a reasonable jury could also find that Yahoo! <u>should have known</u> that infringing web site owners were improperly using Plaintiff's name for commercial purposes, in violation of the Lanham Act, given Plaintiff's repeated documented correspondence to Yahoo!

Yahoo's lawyers offer no contrary explanation, and even if they had bothered to do so, such "explanation" would only highlight the need for <u>full</u> discovery, followed by a <u>trial.</u>

### 2. <u>Plaintiff Has Stated Viable State Law Claims</u>

Lastly, Yahoo's lawyers urge this Court to dismiss Plaintiff's claims brought under Wisconsin law. They first assert that Plaintiff has not sufficiently alleged that Yahoo! has used her name for advertising purposes. Once again, "bev stayart" is a <u>competitive advertising keyword</u>. And Yahoo! is in the business of selling "keyword"

26

advertising to companies marketing their products and services on the Internet.

Keeping in mind this fact, the Court is also referred to *Brown v. ACMI Pop Division*, 375 Ill. App. 3d 276, 873 N.E. 2d 954 (1st Dist. 2007), *appeal denied*, 226 Ill. 2d 580, 879 N.E. 2d 929 (2007). *See*, Appendix O. There, a company named Corbis owned a photo archive. It licensed copyright permissions for visual images. It posted "degraded" versions of these images on the Internet for browsing by customers. The Corbis' website expressly warned customers that it did not hold any publicity rights, and suggested that customers separately obtain such rights.

Singer James Brown, and later his estate, sued Corbis on the theory that Corbis' conduct violated Brown's right of publicity. After denying a motion to dismiss, the trial court in Chicago certified the question of whether it had erred by "rejecting Corbis' argument that the undisputed facts show that Corbis did not use photographs of James Brown for an improper commercial purpose under either the Illinois common law or the Illinois Right of Publicity Act."

The Illinois appellate court in Chicago affirmed the denial of Corbis' motion to dismiss, and said:

> The parties' arguments are all compelling. However, whether the facts as alleged support Brown's action for a violation of the Publicity Act depends on how Corbis's actions are defined. In this case of "apples v. oranges," Corbis argues that in displaying photographs of James Brown on its Web Site, it is *not selling a product* but rather *offering to license the copyrights* it holds on the photographs. Corbis argues that any action by Brown for improper use of the photos by the end user licensee lies against that end user and not Corbis.
>
> In light of the vast difference of opinion regarding the interpretation of the definition of what Corbis sells and the legal effects of such sales, we cannot say that the facts are undisputed that Corbis's display of the photos of James Brown on its Web site did not in some way constitute an improper commercial use under

27

either the Illinois common law or the Publicity Act. We therefore cannot conclude that the trial court erred in denying Corbis's motion to dismiss.

Yahoo! in the past has used people's name or image for commercial purposes, without their permission. This includes "celebrity" Tom Brady and "non-celebrity" Shannon Stovall. Under such circumstances, a reasonable jury could find that Yahoo! has again done the same with regard to Bev Stayart, in violation of Wisconsin law.

Every litigant has the right to prove their allegations by circumstantial evidence, which consists of proof of facts and circumstances from which the jury may infer other connected facts, reasonably following from the previous facts and circumstances. *Standburg-Schiller v. Rosello*, 119 Ill. App. 3d 318, 335, 456 N.E. 2d 192 (1st Dist. 1983). As the Supreme Court has observed, "direct evidence of a fact is not required. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S. Ct. 6, 11, 5 L. Ed. 2d 29 (1960).

Furthermore, as explained in *Ellis Fischel State Cancer Hospital v. Marshall*, 629 F. 2d 563, 566 (8th Cir. 1980):

> The presence or absence of . . . [improper] motive is a legal conclusion and is provable by circumstantial evidence even if there is testimony to the contrary by witnesses who perceived lack of such improper motive. [Citations omitted.]

With regard to damages, Yahoo's lawyers claim that Plaintiff doesn't have any because her name has no "commercial" value. GIVE ME A BREAK! This is the same rationale every defense counsel spews: "My client didn't do anything; if my client did something, they aren't liable; and if they are liable, what they did isn't worth anything!"

28

This same argument was rejected by a federal court in Chicago when it had the opportunity to interpret the Illinois Right of Publicity Act. And this argument should be rejected again by this Court. *See, Villalovos v. Sundance Associates, Inc.*, 2003 WL 115243 (N.D. Ill.), 31 Media L. Rptr. 1274. *See*, Appendix P.

In that case, the defendants published a hard-core pornographic magazine. The issue in question contained a personal ad that included a photo of a woman. The ad copy need <u>not</u> be repeated. The first name, last initial and full address were those of the plaintiff. But the woman in the photo was <u>not</u> the plaintiff. She asserted that she suffered "severe" mental damages when, as a result of the ad, strangers sent "astonishing, lude [*sic*], and offensive" communications to her at her home address, 2003 WL 115243 at *1.

The defendants moved to dismiss the complaint, per F.R. Civ. P. 12(b)(6), as here. Among other things, the defendants argued that the plaintiff's name had no commercial value. But the court concluded dismissal was not appropriate, explaining:

> Significantly, the [Illinois Publicity] Act makes no effort to limit the tort to instances where a plaintiff can demonstrate intrinsic value; it simply protects an individual's identity. Indeed, an individual is defined as meaning "any living or deceased natural person, regardless of whether the identity of that individual has been used for a commercial purpose during the individual's lifetime." 765 ILCS 1075/5. Likewise, an identity encompasses "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener, including but not limited to (i) names, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice." *Id.* Nowhere does the Act require the identity to have commercial value. To the contrary, the <u>Act appears to cover all individuals, whether or not their identities have been used commercially.</u> (emphasis added)

*Villalovos*, 2003 WL 115243 at *5.

The *Villalovos* case was cited with approval by Judge Joseph N. Laplante in Concord, New Hampshire, in connection with his opinion in *Doe v. FriendFinder*

29

*Network, Inc.*, 540 F. Supp. 2d 288 (D. N.H. 2008). Amazingly, Yahoo's lawyers fail to cite to the Court either the *Villalovos* decision or the *Doe v. FriendFinder* decision in their "exposition" of the law applicable to this case.

Additionally, a strong rationale for protecting the publicity rights of an individual is found in the prevention of fraudulent business practices. Felcher & Rubin, *Privacy, Publicity and the Portrayal of Real People by the Media*, 88 YALE LJ 1577, 1600 (1979). *See, e.g., Hirsch v. S. C. Johnson & Son, Inc.*, 90 Wis. 2d 379, 280 N.W. 2d 129 (1979) (public deceived by false impression that famous athlete endorsed women's shaving gel).

The Supreme Court has stated that "the rationale for [protecting the right of publicity] is the straightforward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 576, 97 S. Ct. 2849, 53 L. Ed. 2d 965 (1977).

Like Various, Yahoo! is no better than the "average thief" and should be treated as a thief by this Court. "Birds of a feather will flock together" (English proverb).

## CONCLUSION

Yahoo! should be put out of business if it takes an Act of Congress to do so. Until that glorious day, this Court should <u>sanction</u> its "attorneys" for their unethical conduct and deny Yahoo's ridiculous motion to dismiss. In the instance that its motion is in any part granted, Plaintiff requests the Court leave to amend the complaint.

30

Respectfully submitted,

BEVERLY STAYART

By /s/ Gregory A. Stayart

May 19, 2009
Date


Gregory A. Stayart, Esq.
N5577 Cobblestone Road
Elkhorn, WI  53121-3820
(262) 740-9012

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 19, 2009, I electronically filed with the clerk of the Court the accompanying Plaintiff Beverly Stayart's Response to Defendant Yahoo! Inc.'s Motion to Dismiss Counts I-VI of Plaintiff's Complaint using the ECF System which will send notification of such filing to registered counsel:

John F. Hovel
@ jfh@kravit.com

David Tonisson
@ tension@sonnenschein.com


/s/ Gregory A. Stayart