## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**BEVERLY STAYART,**

                     Plaintiff,

                                                   **Case No. 09-C-116**

        **-vs-**

**YAHOO! INC., OVERTURE SERVICES, INC.,**
**d/b/a ALTA VISTA and VARIOUS, INC.,**
**d/b/a FRIENDFINDER.COM,**

                     Defendants.

---

## DECISION AND ORDER

---

       The plaintiff, Beverly Stayart ("Stayart"), conducted search engine queries with her own name as a search term, and she didn't like the results. Her queries produced links to pornographic websites, online pharmacies promoting sexual dysfunction drugs, and an adult-oriented online dating service. Stayart alleges that the defendants, Yahoo! Inc. ("Yahoo!"), Overture Services, Inc. ("Overture"), and Various, Inc. ("Various"), knowingly and intentionally used her name on the internet without authorization. She brings three claims against each of the three defendants for a total of nine claims: (1) False Endorsement under the Federal Lanham Act; (2) Violation of Statutory Right of Privacy (Wis. Stats. § 995.50); and (3) Violation of Common Law Right of Privacy.

       Defendants moved to dismiss, and in response, Stayart moved for sanctions. For the reasons that follow, defendants' motions to dismiss are granted. Stayart's request to replead

is denied, but the Court relinquishes jurisdiction over her supplemental state law claims. In addition, Stayart's motions for sanctions are denied.

## BACKGROUND[1]

Yahoo! is a Delaware corporation with its principal place of business in California. Yahoo! provides a commercial search engine at its main interactive website, www.yahoo.com. This search engine is the second-largest search engine on the internet. Before it was merged into Yahoo!, Overture[2] was formerly a Delaware corporation with its principal place of business in California. Overture provides a commercial search engine at its main interactive website, www.altavista.com.

Various is a California corporation with its principal place of business in California. Various owns approximately 25 "web communities" where "over 100 million registered members" meet each other through computer personals. These include non-sexual networks, such as www.friendfinder.com and www.seniorfriendfinder.com. Through its AdultFriendFinder service (www.adultfriendfinder.com), Various markets and sells on-line adult-oriented social networking services to individuals, including what it advertises as "the world's largest adult social personals with over 20,000,000 members."

Stayart lives in Elkhorn, Wisconsin, Walworth County. She holds a Bachelor's Degree from the University of Iowa and an M.B.A. from the University of Chicago. Prior

---

[1] The following factual background is taken from Stayart's complaint, which the Court accepts as true for purposes of this motion.

[2] During the relevant time period, Overture was operated by Yahoo!, and they are no longer separate entities. The claims against Yahoo! and Overture are identical, and the Court treats them as such.

to May, 2000, Stayart lived in Chicago for many years. Stayart was previously employed by several major financial institutions in Chicago, attaining the position of Vice President.

Stayart is frequently involved in animal protection programs throughout the world, as well as genealogy research throughout the world. Stayart actively participated in recent campaigns to save the wild horse population in the United States; to save the baby seal population in eastern Canada; and to prohibit the aerial shooting of wolves in the United States.

Stayart regularly uses the Internet in support of her animal protection activities and genealogy research. For example, Stayart contributes to an online discussion forum for research and genealogical data concerning the Siouan people (Saponi) at www.saponitown.com. This third-party website contains Stayart's photo, address and other personal information. Stayart's periodic, scholarly posts on this third-party website have generated almost 17,000 hits during the past three years. In addition, two poems written by Bev Stayart appear on two Danish websites supporting the preservation of the baby seal population in eastern Canada.

Stayart is a "sophisticated, well-educated, and highly intelligent professional woman, with important and valuable friends and business contacts throughout the world." (Complaint, D. 1, ¶ 18). On information and belief, Stayart is the only Beverly Stayart and Bev Stayart on the internet. She uses both names. Stayart in no way has ever engaged in a promiscuous lifestyle, or other overt sexual activities, which she and a large portion of her community and social circle consider perverse and abhorrent. Plaintiff alleges that the name

-3-

"Bev Stayart" has commercial value because of her humanitarian endeavors, positive and wholesome image, and the popularity of her scholarly posts on the Internet. Plaintiff has never given the defendants or any third party any permission, authority, or license to use or sell the right to use the name "Bev Stayart" for the promotion of any goods or services on the Internet, or in any other media, either directly or indirectly.

On various occasions between September and December of 2008, Stayart performed web searches on the internet using "Bev Stayart" as a search term on various commercial search engines, including www.yahoo.com and www.altavista.com. Stayart alleges that Yahoo! and Overture knowingly used plaintiff's name "Bev Stayart" on a false snippet on their search engine results by (1) repeatedly linking Plaintiff to the advertising of Cialis by an online pharmacy; (2) repeatedly linking Plaintiff to six separate websites playing pornographic videos containing computer spy ware; and (3) repeatedly linking Plaintiff to a website captioned "Free Streaming Porn – HOTTEST DAILY PORN" displaying 27 hard-core pornographic photos. For example, Stayart alleges that she typed "Bev Stayart" into Yahoo!'s search engine on September 9, 2008, and received the following result:

> Pm kb Loading Cialis – Online Pharmacy
> Pm 10kb loading cialis January th, at: pm hi friends I met you
> in the tim horton s on bloor st a few Sundays ago I . . . on
> February
> bev stayart on march th . . .
> chitosan-as-a-pharmaceutical-excipient.pills-n-health.cn/...

(Complaint, ¶ 60). Stayart alleges that Yahoo! and Overture knowingly connected and continues to connect her name (Bev Stayart) with the sexual dysfunction drugs Cialis, Viagra and Levitra on its search engine results for her.

-4-

Stayart notified Yahoo! by emails on September 9-10, 2008 that its search engine was generating illegitimate search results linking her to a sexual dysfunction drug, hard-core pornographic websites, and an online pharmacy promoting Cialis. Stayart also retained a lawyer who requested that the illegitimate search results be removed from Yahoo!'s websites. Yahoo! responded as follows: "We do not aim to judge web content for appropriateness or censor materials that we find offensive or inappropriate. Instead, we present information as it is reflected on the Web, allowing you to draw your own informed conclusions about what you see." Complaint, ¶ 105.

Stayart also alleges that Various used the name "Bev Stayart" on a website advertising its adult, online sexually-oriented dating service AdultFriendFinder.com without permission or authorization. On December 5, 2008, Stayart typed "Bev Stayart" into www.altavista.com and received the following result:

> store place.007webs.com/freec6.html
> http://yorkie-puppies.doorway.orge.pl/dinosaur-main-titles-mp3.
> html . . . **http://jewellery-makin-doorway.orge.pl/bev-stayart.html**
> bev stayart . . . storeplace.007.webs.com/free.c6.html
> More pages from store place.007webs.com

Complaint, ¶ 114. Stayart clicked on the http://jewellery-makin-doorway.orge.pl/bev-stayart.html link and an "Under Construction" website appeared titled "Meet AdultFriendFinder members near Janesville [Wisconsin] – Over 20 Million Members" and containing five graphic images of fully or partially nude women who are exhibiting their breasts and buttocks in a sexually suggestive manner. These photos are accompanied by the age, nickname and city of residence of the women. The URL  http://jewellery-makin-

Case 2:09-cv-00116-RTR   Filed 08/28/09   Page 5 of 27   Document 41

doorway.orge.pl/bev-stayart.html appears at the bottom of the page. *See* Complaint, Exhibit
LL.

## ANALYSIS

When deciding a motion to dismiss for failure to state a claim, the Court must accept
as true all well-pleaded facts and draw all permissible inferences in the plaintiff's favor.
While a complaint "does not need detailed factual allegations, a plaintiff's obligation to
provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions,
and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp.
v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right
to relief above the speculative level, on the assumption that all the allegations in the
complaint are true (even if doubtful in fact)." *Id.*

The Court need not accept as true the "threadbare recitals of a cause of action's
elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 129 S. Ct. 1937,
1949 (2009). "A claim has facial plausibility when the pleaded factual content allows the
court to draw the reasonable inference that the defendant is liable for the misconduct
alleged." *Id.* The plausibility standard is not akin to a "probability requirement," but it asks
for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Notice pleading
"marks a notable and generous departure from the hyper-technical, code-pleading regime of
a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing
more than conclusions." *Id.* at 1950.

-6-

A party can also "plead itself out of court by pleading facts that establish an impenetrable defense to its claims. A plaintiff 'pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits.' If the plaintiff voluntarily provides unnecessary facts in her complaint, the defendant may use those facts to demonstrate that she is not entitled to relief." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008). The Court may consider the exhibits attached to Stayart's complaint in determining whether she states a valid claim for relief. *See Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005); Fed. R. Civ. P. 10(c).

## I.     Lanham Act – False Endorsement

Section 43(a)[3] of the Lanham Act provides two general theories of liability: (1) false representations regarding the origin, endorsement, or association of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device ("false endorsement" or "false association"); and (2) false representations in advertising

---

[3] The full text of Section 43(a) (15 U.S.C. § 1125(a)) provides as follows:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --

    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be held liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

-7-

concerning the quality of services or goods ("false advertising"). *See L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir. 1993). Stayart's Lanham Act claim is a false endorsement claim.

False endorsement occurs when a person's identity is connected with a product or service in such a way that consumers are likely to be misled about that person's sponsorship or approval of the product or service. *See ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 925-26 (6th Cir. 2003). "A false endorsement claim based on the unauthorized use of a celebrity's identity . . . alleges the misuse of a trademark, . . . such as visual likeness, vocal imitation, or other uniquely distinguishing characteristic, which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product." *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992). The "mark" at issue is the plaintiff's identity. *Id.*; *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 626 (6th Cir. 2000). While many of these cases arise in the context of a popular celebrity, some cases hold that popularity or celebrity status is not a necessary prerequisite for a successful false endorsement claim under the Lanham Act. *See, e.g., Hauf v. Life Extension Found.*, 547 F. Supp. 2d 771, 777 (W.D. Mich. 2008); *Ji v. Bose Corp.*, 538 F. Supp. 2d 349, 351 (D. Mass. 2008); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 306 (D.N.H. 2008).

### A. Prudential Standing

The plain language of the Act provides standing to "any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a). While this language implies a broad reach, the focus of the Lanham Act is on "*anti-competitive conduct in a*

-8-

*commercial context.* Conferring standing to the full extent implied by the text of § 43(a) would give standing to parties, such as consumers, having no competitive or commercial interests affected by the conduct at issue." *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 229 (3d Cir. 1998) (emphasis added); *Proctor & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 561 (5th Cir. 2001). In order to satisfy the prudential standing requirement for a false endorsement claim under the Lanham Act, Stayart must "at least allege an existing intent to commercialize an interest in identity." *Condit v. Star Editorial, Inc.*, 259 F. Supp. 2d 1046, 1052 (E.D. Cal. 2003); *Hutchinson v. Pfeil*, 211 F.3d 515, 521 (10th Cir. 2000) ("mere potential of commercial interest . . . is insufficient to confer standing for [a] false association claim"); *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 873 (10th Cir. 1995) ("Although plaintiff asserts that he has plans to compete . . . and would like to use his name in a trademark, the mere potential of commercial interest . . . is insufficient to confer standing").

In *Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*, 871 F.2d 697 (7th Cir. 1989), members of the Dovenmuehle family brought suit after selling their family business, alleging that defendants' use of the trade name "Dovenmuehle, Inc." violated § 43(a) of the Lanham Act. The court recognized that the class of parties with standing under § 43(a) is "quite broad" and that all a commercial party needs to bring suit under the Act is a "'reasonable interest to be protected' against activities that violate the Act." *Id.* at 700. However, the plaintiffs could not "premise their claim upon any contention that they have been damaged or are likely to be damaged in any commercial activity as a result of defendants' use of the

-9-

trade name 'Dovenmuehle, Inc.' None of the plaintiffs are engaged in competition, even indirectly, with the defendants. Nor do they claim any present intention to operate a commercial activity under the name 'Dovenmuehle.'" *Id.*

Similarly, Stayart is not engaged in the commercial marketing of her identity, and she does not allege an intent to commercialize. Stayart alleges that her name has commercial value, but it is clear that Stayart's complaint arises from the distasteful association of her name with pornographic images, advertisements for sexual dysfunction drugs, and a sexually-oriented dating service. Plaintiff alleges that she "in no way has ever engaged in a promiscuous lifestyle, or other overt sexual activities, which she and a large portion of her community and social circle consider perverse and abhorrent," Complaint, ¶ 20, but the "emotional desire to prevent others from using" her name "does not create Lanham Act standing." *Dovenmuehle* at 701. This emotional, non-commercial concern is underscored by Stayart's correspondence with Yahoo! that is attached to her complaint. *See* Compl. at Ex. CC ("my privacy and reputation have been seriously violated and defamed"); Ex. DD, EE ("This material is both pornographic and demeaning to her. The site is using her name without her permission to defame and denigrate her good name"); Ex. Z ("I believe that Yahoo! has invaded my privacy by the publishing, and/or facilitating the publishing, of false and defamatory pornographic photos purporting to be me"). Stayart's pleading is a transparent and artful attempt to bring her claim under the umbrella of the Lanham Act. "Congress has not evinced an intent to create a federal 'false light' tort claim for

-10-

misappropriation of image or identity, absent commercialization." *Condit*, 259 F. Supp. 2d at 1054.

Stayart argues that *Dovenmuehle* (and other cases cited therein) are inapposite because they interpreted the Lanham Act as it was written prior to the Trademark Law Revision Act of 1988. *See, e.g., Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686, 692 (2d Cir. 1971); *Smith v. Montoro*, 648 F.2d 602, 608 (9th Cir. 1981). Stayart is mistaken. "Congress intended that the section 43(a) amendments largely codify pre-1988 case law." *ALPO PetFoods v. Ralston Purina Co.*, 913 F.2d 958, 964 n.6 (D.C. Cir. 1990); *see also Bristol-Meyers Squibb Co. v. McNeil-P.P.C.,* Inc., 973 F.2d 1033, 1038 n.1 (2d Cir. 1992) ("precedents predating the new language remain in force"); *Condit* at 1050 (amendments "should not be regarded as either limiting or extending applicable decisional law" as it pertains to standing issue)(citing Senate Report No. 100-515, Section 35). Case law interpreting the pre-Amendment version of the Lanham Act is still relevant in determining whether a party has standing.

Stayart relies on *Doe v. Friendfinder*, which held that an anonymous, non-celebrity plaintiff could state a Lanham Act false endorsement claim based on a false profile created on an online dating website.[4] 540 F. Supp. 2d at 306. The Lanham Act claim in *Doe* survived a Rule 12(b)(6) motion, but the court did not address "prudential standing" in its decision. Prudential standing is not "jurisdictional" in the same sense as Article III standing, so the lack of a prudential standing discussion in *Doe* is not surprising. "[A] court may raise

---

[4] Various was one of the defendants in *Doe*.

an unpreserved prudential-standing question on its own, but unlike questions of constitutional standing, it is not obliged to do so." *Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 757 (7th Cir. 2008). The ruling in *Doe* does not undermine the Court's holding that Stayart lacks standing to pursue a Lanham Act claim.

Therefore, in the context of Stayart's detailed, prolix complaint, the Court must conclude that the absence of any factual allegations pertaining to the commercialization of her identity means that she cannot meet this basic requirement for obtaining relief under the Lanham Act. Stayart's allegations fail to raise her right to relief above the speculative level.

**B.     Likelihood of Confusion**

The key issue in a false endorsement case is whether "defendant's use of the mark to identify its goods or services is likely to create confusion concerning the plaintiff's sponsorship or approval of those goods or services." *Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1014 (3d Cir. 2008). Plaintiff must be able to show that "the public believe[s] that 'the mark's owner sponsored or otherwise approved of the use of the trademark.'" *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 626 (6th Cir. 2000). Even if Stayart is engaged in commercial activity with respect to her identity, a commonsense reading of the complaint demonstrates that there could be no likelihood of confusion.

Courts analyze a variety of factors to determine whether the use of a mark creates the likelihood of confusion, including the level of plaintiff's recognition among the segment of the society for whom defendant's product is intended, the relatedness of plaintiff's fame or success to defendant's product, and defendant's intent in selecting the plaintiff. *See*

-12-

*Kournikova v. Gen. Media Commc'n, Inc.*, 278 F. Supp. 2d 1111, 1120-21 (C.D. Cal. 2003)(citing *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007-08 (9th Cir. 2001) and *AMF, Inc. v. Skeelcraft Boats*, 599 F.2d 341 (9th Cir. 1979)); *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002). Stayart cannot satisfy this requirement as a matter of law because her complaint *explicitly disavows* any association with pornographic materials, sexual dysfunction drugs, or sexually-oriented dating services (i.e., Various' website AdultFriendFinder.com). As noted above, Stayart alleges that "in no way has [she] ever engaged in a promiscuous lifestyle, or other overt sexual activities, which she and a large portion of her community and social circle consider perverse and abhorrent." Complaint, ¶ 20. This allegation contravenes the likelihood of confusion, and Stayart pleaded herself out of court on her Lanham Act claim. No one who accessed these links could reasonably conclude that Bev Stayart endorsed the products at issue.

More specifically, Stayart argues that Various can be held liable under the doctrine of initial interest confusion. "Initial interest confusion, which is actionable under the Lanham Act, occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *Promatek*, 300 F.3d at 812. It is a "bait and switch" tactic that permits a competitor to lure consumers away from a service provider by passing off services as those of the provider, notwithstanding that the confusion is dispelled by the time of sale. *See Vail Assoc., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 872 (10th Cir. 2008).

Stayart appears to be arguing that a person's initial interest in Bev Stayart leads them to click on the http://jewellery-makin-doorway.orge.pl/bev-stayart.html URL, which then leads them to the "Under Construction" site with the AdultFriendFinder banner ad. "[A]ctionable initial interest confusion on the Internet is determined, in large part, by the relatedness of the goods offered and the level of care exercised by the consumer." *Interstellar Starship Serv., Ltd. v. Epix*, 304 F.3d 936, 945 (9th Cir. 2002). The Court's prior discussion still rings true. Stayart's identity is completely unrelated to the services offered by the AdultFriendFinder site. "[I]n the absence of these factors [i.e., product relatedness and level of care], some initial confusion will not likely facilitate free riding on the goodwill of another mark, or otherwise harm the use claiming infringement. Where confusion has little or no meaningful effect in the marketplace, it is of little or no consequence" in establishing initial interest confusion. *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, 297 (3d Cir. 2001). The type of person looking for information about Bev Stayart would not be fooled into using an online adult-oriented dating website.

## II. Immunity under the Communications Decency Act ("CDA")[5]

In 1996, Congress passed the Communications Decency Act ("CDA"), 47 U.S.C. § 230. The CDA was a congressional attempt to "remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." § 230(b)(4). At the

---

[5] To the extent that the defendants raise an immunity defense, their motions are properly brought as motions for judgment on the pleadings. *See Chicago Lawyer's Comm. v. Craigslist, Inc.*, 519 F.3d 666, 672 (7th Cir. 2008).

Case 2:09-cv-00116-RTR   Filed 08/28/09   Page 14 of 27   Document 41

same time, Congress sought to "promote the continued development of the Internet and other interactive computer services and other interactive media." § 230(b)(1).

Accordingly, the CDA provides that no "provider or user of an *interactive computer service* shall be treated as the publisher or speaker of any information provided by another *information content provider*." § 230(c)(1) (emphases added). The terms "interactive computer service" and "information content provider" have specific statutory definitions. An interactive computer service (an "ICS") "means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educations institutions." § 230(f)(2). An information content provider "means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3).

Consistent with the Congressional policy in favor of the expansive application of CDA immunity, the definition of interactive computer service is construed broadly, while the definition of information content provider is construed narrowly. *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003). This represents a "legislative judgment to effectively immunize providers of interactive computer services from civil liability in tort with respect to material disseminated by them but created by others." *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998); *see also Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) ("The majority of federal circuits have interpreted

the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service"). The Fourth Circuit explains:

> Congress' purpose in providing the § 230 immunity was thus evident. Interactive computer services have millions of users. The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer services providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).

CDA immunity is not absolute. Among other exceptions, the CDA provides that nothing "in this section shall be construed to limit or expand any law pertaining to intellectual property." § 230(e)(2). For example, if Stayart successfully stated a claim for false endorsement under the Lanham Act, Yahoo! would not be immune from liability for those claims because such a claim would probably be considered an intellectual property claim. However, one of the fatal flaws in Stayart's Lanham Act claim is that Yahoo! did not use Stayart's name in connection with their own goods or services. *See Heartbrand Beef, Inc. v. Lobel's of New York, LLC*, No. V-08-62, 2009 WL 311087, at *3 (S.D. Tex. Feb. 5, 2009). Yahoo!'s search results include abstracts, or snippets, that contain multiple samples of text appearing in various places on the third-party websites. Yahoo! does not create this

-16-

content, it only displays the content in response to a C-user's search results.  It follows that Yahoo! did not create the content Stayart complains about.

Since Yahoo! did not create the content Stayart finds objectionable, the only way the intellectual property carve-out applies is if Yahoo! can be held secondarily liable under theories of vicarious liability or contributory infringement.  *See Hard Rock Café Licensing Corp. v. Concessions Servs., Inc.*, 955 F.2d 1143 (7th Cir. 1992).  Even after receiving Stayart's complaints, Yahoo! cannot be held liable for failing to remove the offending search results.  Yahoo! did not create the offending content and did not exert any control over the third party websites where the alleged infringement occurred.  *See Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999) (courts consider the "extent of control exercised by the defendant over the third party's means of infringement"); *SB Designs v. Reebok Int'l, Inc., Ltd.*, 338 F. Supp. 2d 904, 913-14 (N.D. Ill. 2004) (defendant that exerted no control over allegedly infringing third-party website cannot be held contributorily liable).  Similarly, Yahoo! cannot be vicariously liable without "a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." *Hard Rock*, 955 F.2d at 1150.

Indeed, the only way Yahoo! could exert any control over the results of a search engine query would be to change its underlying, proprietary algorithm.  This goes to the heart of Yahoo!'s role as an interactive computer service.  "[O]rdinary search engines [such as Google and Yahoo!] do not use unlawful criteria to limit the scope of searches conducted on

-17-

them, nor are they designed to achieve illegal ends. . . . Therefore, such search engines play no part in the 'development' of any unlawful searches." *Fair Housing Council of San Fernando Valley v. Roomates.com, LLC*, 521 F.3d 1157, 1167 (9th Cir. 2008). In this respect, Yahoo! should be entitled to immunity because it acted as an interactive computer service, even though Stayart's claims are nominal intellectual property claims. *See, e.g., Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006) (Google qualified as an interactive service provider because "[i]n each instance raised by Plaintiff's tort claims, Google either archived, cached, or simply provided access to content that was created by a third party"); *Murawski v. Pataki*, 514 F. Supp. 2d 577, 591 (S.D.N.Y. 2007) (ICS cannot be held liable for text displayed when plaintiff ran a search for his own name, because the text was "information provided by another information content provider"). Immunizing Yahoo! from Stayart's claims would not limit the laws pertaining to intellectual property because Stayart does not state a valid intellectual property claim. *See Gucci Am., Inc. v. Hall & Assoc.*, 135 F. Supp. 2d 409, 413 (S.D.N.Y. 2001) (refusal to apply doctrine of contributory infringement to an ISP would limit the laws pertaining to intellectual property in contravention of § 230(e)(2)).

Things are less clear with respect to Various. In some contexts, the AdultFriendFinder website acts as an interactive computer service, but Stayart's complaint relates to the content of the AdultFriendFinder banner ad that was associated with the http://jewellery-makin-doorway.orge.pl/bev-stayart.html URL. "A website operator can be both a service provider and a content provider: If it passively displays content that is created

-18-

entirely by third parties, then it is only a service provider with respect to that content.  But as to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing, the website is also a content provider."  *Roommates*, 521 F.3d at 1162-63. Various' role in the creation of the banner ad content is unclear.  At the pleading stage, the Court is unable to conclude that Various is entitled to immunity.

## III.    Supplemental jurisdiction

Stayart asks the Court to assert supplemental jurisdiction[6] over her state law right to privacy claims.  *See* 28 U.S.C. § 1367.  The "general rule is that when as here the federal claim drops out before trial (here *way* before trial), the federal district court should relinquish jurisdiction over the supplemental claim."  *Van Harken v. City of Chi.*, 103 F.3d 1346, 1354 (7th Cir. 1997); § 1367(c)(3).  The presumption in favor of dismissal is strong because once the federal claims give way, "respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 728 (7th Cir. 1998).  One exception to the general rule is when "it is obvious how the claims should be decided." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007); *see also Van Harken*, 103 F.3d at 1354 (if an "interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery

---

[6]   Stayart does not allege jurisdiction under the federal diversity statute, 28 U.S.C. § 1332, even though it appears that the parties may be completely diverse.  *See Boggs v. Adams*, 45 F.3d 1056, 1059 n.7 (7th Cir. 1995) (plaintiffs invoking diversity must allege that the amount in controversy exceeds the jurisdictional amount); *Simon v. Allstate Employee Group Med. Plan*, 263 F.3d 656, 657 n.1 (7th Cir. 2001) (allegation of residency is insufficient to establish diversity jurisdiction).

-19-

then and there, rather than burdening the state courts with a frivolous case"). In the interests of judicial economy, the Court will analyze the merits of Stayart's state law claims to determine whether they can be easily resolved here in federal court.[7]

Stayart asserts a common law and statutory right to privacy claim against Yahoo! and Various. At common law, there were four distinct privacy torts: (1) intrusion into seclusion, solitude, or private affairs; (2) public disclosure of embarrassing private facts; (3) false light invasion of privacy; and (4) appropriation of the plaintiff's name or likeness. *See Hirsch v. S.C. Johnson & Son, Inc.*, 90 Wis. 2d 379, 280 N.W.2d 129 (1979) (citing Prosser, *Privacy*, 48 Cal. L. Rev. 383, 389 (1960)). Wis. Stat. § 995.50 codifies three of the four torts,[8] including the misappropriation tort. The relevant section defines "invasion of privacy" as the "use, for advertising purposes or for purposes of trade, of the name, portrait or picture of any living person, without having first obtained the written consent of the person . . ." § 995.50(2)(b).

In response to the motions to dismiss, Stayart characterizes her claim as a "right to publicity" claim. In a case involving the famous football player Elroy "Crazy Legs" Hirsch, Wisconsin recognized the "right to publicity" as the "right of a person to be compensated for the use of his name for advertising purposes or purposes of trade," which is "distinct from

---

[7] The other exceptions are when the statute of limitations has run on the pendent claim, and when the interests of judicial economy point towards federal retention. *See Wright v. Associated Ins. Co., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). Neither exception applies here. *See* Wis. Stat. § 893.57 (2 year statute of limitations for intentional torts); "[R]arely when a case is dismissed on the pleadings can 'judicial economy' be a good reason to retain jurisdiction." *Wright* at 1251.

[8] The statute does not codify the "false light" privacy claim.

other privacy torts which protect primarily the mental interest in being let alone. The appropriation tort is different because it protects primarily the property interest in the publicity value of one's name." *Hirsch*, 90 Wis. 2d at 387. The claim involves "the right of control of the commercial aspects of one's identity." *Id.* A plaintiff must possess a "property right in his name or identity, which has been appropriated without consent by another for purposes of trade." *Id.* at 397. Defendants argue that Stayart cannot state a right to publicity claim because her name lacks sufficient commercial value.

However, the leading treatise recognizes that the "right to publicity" is really an offshoot of the more general "appropriation" tort. *See* J. Thomas McCarthy, *The Rights of Publicity and Privacy*, § 5.60 (2d ed. 2008). Both torts involve the unpermitted use of an individual's identity, but there are important distinctions between the two torts that are relevant to this case:

> The appropriation branch of the right of privacy gives control over another's commercial use of one's identity only insofar as one can establish some bruised feelings. The interest protected is purely one of freedom from a particular kind of infliction of mental distress. The right of publicity takes the next logical step and makes the right of control over commercial use of one's identity complete by giving to each person a complete right to control all unpermitted use of one's personality, that is, the right to prevent commercial use regardless of the infliction of mental distress.

1 McCarthy, *Rights of Publicity*, § 5.67. More succinctly, Professor McCarthy states that the "critical difference is the nature of the right invaded: either psyche or pocketbook." *Id.*

-21-

When viewed through this lens, it appears that Stayart could state a claim based upon a pure appropriation theory, as distinguished from a pure right to publicity theory.[9]

Moreover, the distinction between an appropriation theory and a right to publicity theory is also relevant with respect to CDA immunity. A "right to publicity" claim like the one recognized in *Hirsch* is generally considered an intellectual property claim, *see Almeida*, 456 F.3d at 1322, which implicates the exception in § 230(e)(2) (nothing "in this section shall be construed to limit or expand any law pertaining to intellectual property"). Further complicating matters is the disagreement among various federal courts regarding the scope of the intellectual property exception. *Compare Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1119 (9th Cir. 2007) (the term "intellectual property" in § 230(e)(2) should be construed to mean "federal intellectual property"); *Doe*, 540 F. Supp. 2d at 302 ("Consistent with its text, § 230(e)(2) applies simply to 'any law pertaining to intellectual property,' not just federal law"); *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 703 (S.D.N.Y. 2009) ("Section 230(c)(1) does not provide immunity for either federal or state intellectual property claims"). To the extent that Stayart is pursuing a right to publicity (intellectual property) theory under state law, the potential application of CDA immunity may present an unsettled issue of federal law.

Ultimately, the Court is unable to conclude that there is an obvious resolution to Stayart's state law claims. Even though the Court already held that Yahoo! was entitled to

---

[9] McCarthy writes: "the Wisconsin law has been characterized as a 'statutory hybrid,' combining specific enumeration of three types of privacy with a general acknowledgment in 895.50(3) of guidance from 'the developing common law of privacy.' That section adopting the 'appropriation' type of invasion of privacy, and arguably also a statutory form of the right of publicity, is modeled upon the New York statute." 1 McCarthy § 6.132.

CDA immunity, the Court cannot say with certainty that a potential right to publicity claim under Wisconsin law is without merit, meaning that the intellectual property exception could save Stayart's claims. Additionally, the application of CDA immunity to the claims against Various is unclear, leaving them potentially liable under either theory (misappropriation or right to publicity). In the event that Stayart re-files her claims in state court, defendants would be free to assert CDA immunity as an affirmative defense. The state courts are well-equipped to resolve the distinction between computer services and content providers under the CDA. *See, e.g., Berg v. Leason*, 32 F.3d 422, 426 (9th Cir. 1994) ("State courts resolve matters of federal law in similar circumstances with no difficulty; neither an affirmative defense based on federal law, nor one based on federal preemption" can divest a state court of jurisdiction over a state law claim).

It could be argued that the Court should retain jurisdiction because the scope of the CDA's intellectual property exception presents an unsettled issue of federal law. *See Perfect 10*; *Doe*; *Atl. Recording*. This concern is too remote to compel the exercise of supplemental jurisdiction at this early stage in the proceedings. The only way the exception could be implicated is if Stayart demonstrates that she has a property interest in the commercial value of her name (like "Crazy Legs" Hirsch), such that her claim could be considered an intellectual property claim. As a practical matter, this is an unlikely scenario, although the Court's reasoning is without prejudice to repleading in state court. "When all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish jurisdiction." *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599,

-23-

607 (7th Cir. 2008). The speculative possibility that an unsettled issue of federal law could arise in state court cannot overcome the presumption in favor of the dismissal of supplemental state law claims.[10]

## IV. Leave to replead

Stayart requests leave to replead if her complaint is deemed insufficient. The Court may deny a request to replead on the grounds of futility. *See DeSalle v. Wright*, 969 F.2d 273, 278 (7th Cir. 1992). Repleading would be futile if the complaint still wouldn't survive a motion to dismiss. *See Garcia v. City of Chi.*, 24 F.3d 966, 970 (7th Cir. 1994). "To hold otherwise would impose upon the defendants and the court the arduous task of responding to an obviously futile gesture on the part of the plaintiffs." *Perkins v. Silverstein*, 939 F.2d 463, 472 (7th Cir. 1991).

In response to the defendants' motions to dismiss, Stayart submits extensive documentary evidence outside of the pleadings in an attempt to avoid dismissal. A brief in opposition to a motion to dismiss cannot amend the complaint. *See Perkins* at 470 n.6. Even considering these extrinsic materials, Stayart continues to stop short of alleging or even arguing that she is marketing or using her name and identity for commercial purposes, a requirement to assert Lanham Act standing. The injuries experienced by Stayart are not the type that Congress sought to redress by creating a private remedy under the Lanham Act. Stayart's request to replead must be denied on the grounds of futility.

---

[10] Even if a state court was forced to decide whether the exception in § 230(e)(2) extends to state intellectual property claims, the United States Supreme Court could theoretically resolve the dispute by granting *certiorari*.

Moreover, in the clear absence of any valid federal claims, Stayart would need an alternative basis to invoke federal jurisdiction on her state law claims. The parties may be diverse, but it does not seem likely that Stayart could make a good faith allegation that her damages are more than $75,000. *See* § 1332(a). Given the likelihood that Stayart's injuries are *de minimus*, granting leave to replead would simply invite more litigation over the propriety of federal jurisdiction. If Stayart wishes to pursue her state law claims separately, it is more efficient for her to do so in state court.[11]

## V.    Sanctions

In response to the defendants' motions to dismiss, Stayart filed motions for sanctions against the attorneys for Yahoo! and Various. Although she cites numerous cases interpreting and applying Fed. R. Civ. P. 11, Stayart's motion is not a Rule 11 motion because she did not comply with Rule 11's "safe harbor" provision. *See* Fed. R. Civ. P. 11(c)(2)(motion must be served under Rule 5, but it must not be filed or presented to the court if the challenged paper is withdrawn or appropriately corrected within 21 days after service).

Stayart cites an alternative basis for the imposition of sanctions, 28 U.S.C. § 1927, which provides that any "attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The Court may impose § 1927

---

[11]  Once again, the Court's reasoning is without prejudice to any request for damages in state court.

sanctions when an attorney acted in an "objectively unreasonable manner" by engaging in "serious and studied disregard for the orderly process of justice;" pursued a claim that is "without a plausible legal or factual basis and lacking in justification;" or "pursue[d] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound." *Jolly Group, Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006). The standard for objective bad faith does not require a finding of malice or ill will; reckless indifference to the law will qualify. *See Dal Pozzo v. Basic Mach. Co., Inc.*, 463 F.3d 609, 614 (7th Cir. 2006).

The underlying basis of Stayart's motion is that the defendants never should have moved to dismiss her complaint in the first instance. This merely represents Stayart's further disagreement with defendants' arguments regarding the sufficiency of her complaint. The Court already explained that defendants' arguments are well-taken. Even if the Court is ultimately proven wrong in its legal analysis, it certainly cannot be said that the arguments made in the motions to dismiss were objectively unreasonable.

More specifically, Stayart argues that defense counsel should be sanctioned for relying upon "obsolete" cases interpreting the Lanham Act. The cases labeled obsolete by Stayart are still good law. Stayart also takes defense counsel to task for failing to cite adverse authority, including *Doe*, a district court case from New Hampshire. Defense counsel did not act unreasonably in failing to cite adverse authority from a non-controlling jurisdiction. *See* SCR 20:3.3(a)(2) (Candor toward the tribunal) (lawyer shall not knowingly fail to

-26-

disclose to the tribunal legal authority in the controlling jurisdiction); General L.R. 83.10(a) (Wisconsin Rules of Professional Conduct apply to proceedings in this district).

Defendants argue that the Court should treat Stayart's motions as Rule 11 motions, the denial of which would allow an award of expenses and attorneys' fees to them as prevailing parties. *See* Fed. R. Civ. P. 11(c)(2). The Court cannot characterize Stayart's motion as a Rule 11 motion because she did not specifically invoke Rule 11. Additionally, the Court may not award attorneys' fees as a sanction when it is acting on its own motion under Rule 11. *See* Fed. R. Civ. P. 11(c)(4); *Methode Elecs., Inc. v. Adam Tech., Inc.*, 371 F.3d 923, 926 (7th Cir. 2004).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.  Yahoo! and Overture's motion to dismiss [D. 12] is **GRANTED**;

2.  Various, Inc.'s motion to dismiss [D. 14] is **GRANTED**;

3.  Stayart's request to replead is **DENIED**;

4.  Stayart's motions for sanctions [D. 22, 24] are **DENIED**; and

5.  This matter is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 28th day of August, 2009.

                              **SO ORDERED,**


                              **s/ Rudolph T. Randa**
                              **HON. RUDOLPH T. RANDA**
                              **Chief Judge**